See also, D.C., 642 F.Supp. 468.

**UNITED STATES of America, Appellant,**

**Commonwealth of Pennsylvania, State of West Virginia, and State of Ohio, Intervenor Plaintiffs in District Court**

**v.**

**WHEELING–PITTSBURGH STEEL CORPORATION.**

**No. 86–3456.**

United States Court of Appeals, Third Circuit.

Argued Feb. 18, 1987.

Decided May 18, 1987.

---

Regina M. Kossek, U.S. E.P.A., Office of Regional Counsel, Chicago, Ill., William D. Evans, Jr. (Environmental Enforcement Section) Jacques B. Gelin (argued), Robert L. Klarquist, Richard E. Ostrod (Appellate Section Office of Enforcement and Compliance Monitoring) Land and Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., James M. Baker, Sr. Asst. Regional Counsel, Office of Regional Counsel, U.S.E.P.A., Philadelphia, Pa., for appellant.

Leonard A. Costa, Jr., David J. Armstrong (argued), Dickie, McCamey and Chilcote, Pittsburgh, Pa., for appellee.

Before SLOVITER, MANSMANN, Circuit Judges, and SCIRICA, District Judge *

**OPINION OF THE COURT**

SLOVITER, Circuit Judge.

On motion of Wheeling-Pittsburgh Steel Corporation (Wheeling) and over the objection of the United States Evironmental Protection Agency (EPA), the district court

---

* Hon. Anthony J. Scirica, United States District Court for the Eastern District of Pennsylvania, sitting by designation.

amended a consent decree which required Wheeling to install pollution control equipment at a Follansbee, West Virginia plant and to achieve compliance with West Virginia's federally approved air pollutant emission limitations by December 31, 1985. The court substituted a provision that contained no fixed compliance date but which was instead dependent upon approval by the West Virginia Air Pollution Control Commission of an alternative proposal submitted by Wheeling. The United States appeals.[1]

## I.

### Background

Wheeling, a steel manufacturer, owns and operates a sinter windbox ("Sinter Plant") at its plant in Follansbee, West Virginia. A sinter windbox is used in a process which fuses residual materials from steel production into sinter which is employed as a feed material in blast furnaces. From a lay standpoint, a sinter plant recycles steel. It is undisputed that Wheeling's Sinter Plant releases particulate emissions at levels in excess of the permissible levels for particulates established by the EPA pursuant to the Clean Air Act (as amended), 42 U.S.C. § 7401 *et seq.*, and the West Virginia State Implementation Plan.

The Clean Air Act (the Act) establishes a combined state and federal program to control air pollution. Under the 1970 amendments to the Act, EPA is required to establish primary and secondary National Ambient Air Quality Standards (NAAQS) for those air pollutants which may endanger public health or welfare. 42 U.S.C. §§ 7408, 7409. Primary standards are designed to protect the public health; secondary standards are designed to protect the public welfare. 42 U.S.C. § 7409(b). As required by the Act, EPA established primary and secondary NAAQS for particulate matter. 40 C.F.R. §§ 50.6, 50.7.

The 1970 Amendments require each state to develop a state implementation plan (SIP) for the "implementation, maintenance and enforcement" of each NAAQS. 42 U.S.C. § 7410(a)(1). The SIP must be submitted for approval to the Administrator of EPA. 42 U.S.C. § 7410(a)(1), (a)(2). The Administrator is required to approve a SIP if it satisfies the requirements set forth in section 110(a)(2) of the Act which mandates inclusion in each SIP of, *inter alia*, air pollutant emission limitations for stationary sources, schedules for compliance, and such other measures as may be necessary to insure attainment and maintenance of the NAAQS. 42 U.S.C. § 7410(a)(2). *See Union Electric Co. v. EPA*, 427 U.S. 246, 257, 96 S.Ct. 2518, 2525, 49 L.Ed.2d 474 (1976). The statute specifies that the SIP must provide for attainment of the applicable primary standard "as expeditiously as practicable" but no later than three years from the date of approval of such plan. 42 U.S.C. § 7410(a)(2)(A).

The Act also requires that revisions to a SIP must be submitted for approval to the Administrator. 42 U.S.C. § 7410(a)(3)(A). *See Train v. Natural Resources Defense Council, Inc.*, 421 U.S. 60, 92, 95 S.Ct. 1470, 1488, 43 L.Ed.2d 731 (1975). As in the case of the original SIP, the Administrator must determine if the revision meets the requirements in section 110(a)(2) of the Act, and has been adopted by the state after reasonable notice and public hearings. 42 U.S.C. § 7410(a)(3)(A). If so, it must be approved. *Id.*

Under the 1970 Amendments, deadlines were imposed by which the states were required to attain primary NAAQS for particulate matter. *See* 42 U.S.C. § 7410(a)(2)(A). The deadline for all states was extended to December 31, 1982, by subsequent amendments to the Act. 42 U.S.C. § 7502(a)(1). However, because of the "unique hardships" in the steel industry and in order to encourage plant modernization the Act was amended in 1981 by the Steel Industry Compliance Extension

---

**1.** West Virginia, which was a party to the consent decree and an intervenor in the district court, has notified this court that it does not intend to actively participate in this appeal but that it would like to continue to be shown as a party. Neither of the other states that intervened has participated in this appeal.

Act (SICEA) to lengthen the time for compliance with SIP air pollution emission standards for steel companies until December 31, 1985. Pub.L. No. 97–23, 95 Stat. 139 (codified at 42 U.S.C. § 7413(e)). H.R. Rep. No. 121, 97th Cong., 1st Sess. 8–9, *reprinted in* 1981 U.S.Code Cong. & Admin.News 56, 59. Under SICEA, the Administrator has the discretion to "consent to entry of a Federal judicial decree, or to the modification of an existing Federal judicial decree" establishing a schedule for compliance by a steel-producing stationary emission source "extending beyond December 31, 1982, but ending not later than 1985" if several conditions, including investment in plant modifications, are met. 42 U.S.C. § 7413(e)(1).

Wheeling operates several plants, including the Sinter Plant, which EPA determined violated various primary NAAQS requirements. On March 19, 1979, Wheeling signed a consent decree with the United States and West Virginia, Ohio and Pennsylvania, the states where the relevant polluting plants were located, which was entered by the District Court of the Western District of Pennsylvania on November 26, 1979. With respect to the Sinter Plant, the decree required Wheeling to complete installation of particulate matter emission control equipment at the Sinter Plant by November 1, 1982, (later extended to November 30, 1982) and to achieve compliance with the West Virginia SIP air pollution emission limitations by December 31, 1982.

In October 1981, Wheeling applied to EPA for relief under SICEA from, among other things, the compliance deadline for the Sinter Plant. On July 15, 1983, a Second Amendment to the consent decree was entered which extended the compliance dates for various Wheeling plants. Part XXIII dealt with the Sinter Plant and extended the date for its compliance to December 31, 1985. App. at 53–54. Under Paragraph 3 thereof, Wheeling was obligated to install the required emission control system in accordance with a schedule which provided for submission of an emission control plan to West Virginia and EPA by December 31, 1984, required Wheeling to negotiate and let all major contracts for the emission control system by April 30, 1985, and required complete installation by November 30, 1985, and compliance with pollution limitations by December 31, 1985. App. at 53–54. Under Part XXVI and Appendix II–A of the Second Amendment, Wheeling obligated itself to make capital expenditures of $3,500,000 for the control system at the Sinter Plant by December 31, 1985. App. at 59, 87.

Wheeling did not make the capital expenditures required by the Second Amendment to the Consent Decree for the Sinter Plant by December 31, 1985, or thereafter. Wheeling did not comply with the pollution limitations for that Plant by December 31, 1985, as required by the Consent Decree, and apparently remains in non-compliance. At least it has never suggested to this court that it has now attained the required ambient air quality standard.

In 1982, EPA issued a policy statement regarding alternative emission systems which allow a state to treat all of the pollution-emitting devices of an existing plant within the same industrial grouping as though they were encased within a single "bubble". *See* Emissions Trading Policy Statement, 47 Fed.Reg. 15076 (1982). Under the "bubble" concept, which has been upheld as a permissible construction by the EPA of the Clean Air Act Amendments of 1977, *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), a state in a non-attainment area may, subject to EPA approval, permit revision of a SIP in a manner which allows a polluter from a stationary source to offset a decrease of pollution control at one source of excess emissions by a compensating increase of control of emissions from other sources, as long as there is no increase in the original emission limits. 47 Fed.Reg. at 15076, 15078.

The Second Amendment permits Wheeling to seek to implement an alternative emission system. According to the terms of Part XXXI, Paragraph 9 of the Second Amendment, however, Wheeling remains obligated to comply with the consent

decree until final approval of an alternative system. The Second Amendment provides:

Defendant is not precluded by this consent decree from applying for an alternative emission reduction option [a "bubble"] involving air pollution emission sources addressed by this Order, pursuant to the Clean Air Act, U.S. EPA's Emission Trading Policy, 47 Fed.Reg. 15076 (April 7, 1982), and any amendments thereto, and applicable State law. *Defendant shall remain obligated to comply with all requirements of this Order which apply to a pending alternative emission reduction application unless and until a proposed alternative emission reduction option is approved under Section 110 of the Clean Air Act and appropriate amendments implementing such option are entered by this Court.*

(Emphasis added). App. at 76–77.

On November 27, 1985, Wheeling filed a Motion in the district court To Amend or Stay Certain Provisions of the Consent Decree relating to several of its polluting sources. Wheeling referred to its petition for reorganization under Chapter XI of the Bankruptcy Code filed April 16, 1985, and a 98 day strike against it between July and October of 1985. With respect to the Sinter Plant, Wheeling sought a stay of its obligation under the Consent Decree to expend $3.5 million and to install the emission control system "pending action by the West Virginia Air Pollution Control Commission and EPA on [Wheeling's] application for a bubble for the sinter plant." Supp.App. at 33.

The EPA objected and sought penalties for Wheeling's failure to install the positive windbox controls as required under the Second Amendment.

On December 23, 1985, the district court issued an order amending the Consent Decree with respect to various facilities. App. at 128–131. For the Sinter Plant emissions, the court substituted for Paragraph 3 of Part XXIII of the Consent Decree which contained the compliance deadlines a new paragraph containing no specific dates for compliance. In effect, the Court indefinitely relieved Wheeling of its obligation to make the expenditures for and install the emission control system at the Sinter Plant. The district court "supplemented" the Second Amendment to the Consent Decree to provide:

3. *Compliance Strategy*

Defendant has proposed that this source be brought into compliance through an alternative emission reduction option or "bubble" proposal. Defendant's "bubble" proposal, which was submitted on May 24, 1984, is pending with the West Virginia Air Pollution Control Commission, hereinafter referred to as "WVAPCC". To facilitate progress on control of this source, the WVAPCC is encouraged to complete its evaluation of Defendant's proposal at the earliest possible date. If the WVAPCC approves the "bubble" proposal within thirty (30) days of this Order and in accordance with Section 110 of the Clean Air Act, 42 U.S.C. § 7410, and the regulations promulgated thereunder, including but not limited to, EPA's Emission Trading Policy, 47 Fed.Reg. 15076 (April 7, 1982), Defendant shall implement the "bubble" proposal within sixty (60) days after approval by the WVAPCC. If the "bubble" proposal is not approved by the WVAPCC within thirty (30) days from the date of this Order, Section 5 of this Order shall be vacated and a hearing shall be had to determine an expeditious schedule of implementing pollution control equipment at the Follansbee Sinter Plant.

App. at 130–131.

On January 7, 1986, EPA filed a Motion to Reconsider and Partially Vacate the December 23 order to the extent that it dealt with the Sinter Plant. EPA also filed a Motion for Civil Contempt and to Enforce Judgment; on February 24, 1986, EPA filed a Motion to Extend Time to Appeal; and on February 25, 1986, EPA filed a Motion for Summary Judgment.

On May 21, 1986, the district court denied all of EPA's motions. In a Memorandum Opinion filed concurrently therewith, the district court stated that the Clean Air

Act permits district courts to extend statutory compliance dates when circumstances warrant and held that the bankruptcy proceeding, the 98 day strike, Wheeling's change in management, and its financial losses, together with Wheeling's development of a dust suppressant program to reduce Sinter Plant emission, constitute changed circumstances which warrant relieving Wheeling of its obligations to install positive windbox controls pending its implementation of and EPA approval of its bubble proposal. App. at 133–142. EPA appeals from the Order of May 21, 1986, denying its motions and from the Order of December 23, 1985, amending the Consent Decree.

## II.

### Discussion

### A.

### Appealability

■ We must first address this court's appellate jurisdiction. Wheeling asserts in its brief, without further explanation, that the district court order modifying the consent decree is not a final order. We reject that contention.

The district court's order of December 23, 1985, modified the Consent Decree by substituting a provision with no specific compliance deadline in lieu of the December 31, 1985, deadline provided in the Second Amendment. It also "temporarily stayed" without date Wheeling's obligation to make capital expenditures for air pollution facilities at the Sinter Plant. Modifications to consent decrees have been reviewed by this court as appealable orders. *See, e.g., Philadelphia Welfare Rights Organization v. Shapp,* 602 F.2d 1114 (3d Cir.1979), *cert. denied,* 444 U.S. 1026, 100 S.Ct. 689, 62 L.Ed.2d 660 (1980) (affirming modification of consent decree requiring Commonwealth to perform medical testing); *Mayberry v. Maroney,* 558 F.2d 1159

(3d Cir.1977) (reversing order modifying consent decree prohibiting placing prisoners in a prison basement).

Furthermore, in *In re Grand Jury Proceedings (U.S. Steel-Clairton Works),* 525 F.2d 151, 154–56 (3d Cir.1975), we held that a district court's order granting an indefinite stay of grand jury proceedings investigating violations of the Clean Air Act by United States Steel Corporation was a final order. There the district court had stayed the federal proceeding pending a final judgment in a state civil contempt action against U.S. Steel for failure to comply with air pollution limitations embodied in a consent decree. We noted that, "[i]nvestigation and possible prosecution of criminal violations of the Clean Air Act is effectively precluded by the district court's stay," and concluded that the district court's indefinite stay "has the practical effect of a dismissal of the proceedings." *Id.* at 155. In this case, the district court's order modifying the Consent Decree has the practical effect of precluding EPA's enforcement of the terms of the Consent Decree, the provisions of the Clean Air Act, and the West Virginia SIP. Whether viewed as an indefinite stay or an amendment of the Consent Decree, the order is final and appealable.[2]

### B.

### Mandatory Compliance Deadlines

In the posture of the case before us, we need not decide if the district court has the power to extend a polluter's compliance date beyond that set by the Clean Air Act and incorporated in Wheeling's Consent Decree with the government and affected states. EPA concedes that the district court retains some equitable discretion in this respect but argues that it abused its discretion by amending the Consent Decree to indefinitely stay Wheeling's obligations to comply with the statutory deadline, the West Virginia SIP and the Consent Decree. Wheeling counters that the district court's

---

**2.** In light of our holding, we need not decide whether the order would also be appealable as an injunction under 28 U.S.C. § 1292(a)(1). *See Sansom Committee v. Lynn,* 735 F.2d 1552, 1553 (3d Cir.), *cert. denied,* 469 U.S. 1017, 105 S.Ct.

431, 83 L.Ed.2d 358 (1984) (holding district court order which extended a deadline provided in a consent decree to be "in the nature of a preliminary injunction" and appealable under 28 U.S.C. § 1292(a)(1)).

action was reasonable in light of Wheeling's circumstances.

In *Weinberger v. Romero-Barcelo,* 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982), a case arising under the Federal Water Pollution Control Act (FWPCA), the Supreme Court held that in light of the purpose and language of the statute and the statutory provisions for fines and criminal penalties to ensure compliance with the FWPCA's prohibition of discharges without an EPA permit, the district court retained the discretion to decline to enjoin discharges by the Navy which had not polluted the waters. The Court relied on the traditional equitable discretion of the federal courts. *Id.* at 311–13, 102 S.Ct. at 1802–04. The Court recognized that in some statutes "Congress ... foreclosed the exercise of the usual discretion possessed by a court of equity," *id.* at 313, 102 S.Ct. at 1804 (citing *TVA v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978) (imminent violation of the Endangered Species Act required injunctive relief)). It also stated that "Congress may intervene and guide or control the exercise of the courts' discretion." *Id.* Although the issue before us, that of statutory and consent decree compliance deadlines, is different than that before the Court in *Romero-Barcelo,* we will assume *arguendo* that the district court retains some equitable discretion to modify those deadlines. To determine the limits, if any, on the courts' equitable discretion, we must look to the "purpose and language of the statute." *Id.* at 314, 102 S.Ct. at 1804.

The language of the SICEA amendments to the Clean Air Act limiting the district court's discretion to extend the deadline is clear. The Act states:

> For a source which receives an extension under this subsection, air pollution requirements specified in Federal judicial decrees entered into or modified under this subsection that involves [sic] such source may not be modified to extend beyond December 31, 1985.

42 U.S.C. § 7413(e)(9); *see also* 42 U.S.C. § 7413(e)(1) ("The Administrator may, in his discretion ... consent to ... the modification of an existing Federal judicial decree ... establishing a schedule for compliance ... but ending not later than December 31, 1985").

The legislative history of SICEA supports a strict construction of the statute's final compliance date of December 31, 1985. The House bill was passed in lieu of the Senate bill, and the House Report makes clear that Congress intended strict compliance with the December 31, 1985, deadline. The Report states:

> The committee emphasizes that the December 31, 1985 deadline is not selected as an arbitrary date for final compliance with the Act. During hearings on this matter, the steel industry agreed without qualification to a 1985 deadline date for meeting existing clean air requirements.

The following testimony expresses this commitment:

> Mr. Waxman. Do you agree that the steel industry can comply with the 1985 deadline date for meeting existing clean air requirements?
>
> Mr. Roderick [United States Steel Corporation]. Yes. There is no qualification on that, and remember that we absolutely will have entered into consent decrees enforceable by the court, and obviously we would be more able to do it by the end of 1985 than we would be by the end of 1982.
>
> So there is no question whatsoever we are serious in the undertaking and we will honor the obligation.
>
> Mr. Waxman. Does anyone on the panel disagree?
>
> [No response.]
>
> Mr. Waxman. The Chair notes that no one is asserting a negative comment. [Hearing (3/25/81) Tr. at 55]
>
> The Committee expects the steel industry to honor this commitment.

H.R.Rep. No. 121, 97th Cong., 1st Sess. 11, *reprinted in* 1981 U.S.Code Cong. & Admin.News at 62.

Congress' concern with its statutory deadline for compliance in SICEA is consistent with its earlier actions in enacting the 1970 and 1977 amendments to the

Clean Air Act which strengthened the provisions of the Act and set mandatory deadlines for developing SIPs and for compliance therewith. In adopting the 1970 Amendments, Congress rejected the terms of the House bill which would have required compliance with primary standards within a "reasonable time" and instead accepted the Senate amendment which required attainment of primary standards within three years. H.R.Conf.Rep. No. 1783, 91st Cong., 2d Sess. 45, *reprinted in* 1970 U.S.Code Cong. & Admin.News 5374, 5377–78. Likewise, when Congress amended the Act in 1977 to provide specific authority for the Administrator to enter into "Delayed Compliance Orders", (DCO), it specifically limited the orders to three years. *See* 42 U.S.C. § 7413(d)(1)(D). In discussing the need for the DCO provision, the House Report criticized the Administrator's practice of entering into compliance agreements that "as construed and applied by EPA [result in] delays [that] are not limited to any particular date or time period." H.R.Rep. No. 294, 95th Cong., 1st Sess. 56, *reprinted in* 1977 U.S.Code Cong. & Admin.News 1077, 1134.

It is evident therefore from the language of the statute and its legislative history that Congress placed great significance on the compliance dates and intended to limit, if not entirely eliminate, the district court's equitable discretion to extend compliance.

### C.

### *Pending "Bubble" Application*

■ Even assuming that the courts have some retained equitable discretion, the district court's reliance on the pending "bubble" application as a basis for its order extending Wheeling's compliance requirement contravenes the consistent judicial interpretation of the Act. EPA does not dispute that Wheeling submitted an alternative emission reduction plan for a "bubble" to the West Virginia agency and that the application is still pending before that agency. EPA argues, however, that the pendency of such an application cannot relieve Wheeling of its obligation to meet its compliance deadlines, and that the district

court's reliance thereon was an error of law. We agree.

The general principle that the company is not relieved of its legal obligation to attain compliance with statutory, regulatory or judicially imposed obligations during the pendency of an application for relief or a variance was emphatically established in *Train v. Natural Resources Defense Council, Inc.*, 421 U.S. 60, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975). There the Court stated:

> As made clear in [*Getty Oil Co. (Eastern Operations) v. Ruckelshaus*, 467 F.2d 349 (3d Cir.1972), *cert. denied*, 409 U.S. 1125, 93 S.Ct. 937, 35 L.Ed.2d 256 (1973)], a polluter is subject to existing requirements until such time as he obtains a variance, and variances are not available under the revision authority until they have been approved by both the State and the Agency. Should either entity determine that granting the variance would prevent attainment or maintenance of national air standards, the polluter is presumably within his rights in seeking judicial review. *This litigation, however, is carried out on the polluter's time, not the public's, for during its pendency the original regulations remain in effect,* and the polluter's failure to comply may subject him to a variety of enforcement procedures.

*Id.* at 92, 95 S.Ct. at 1488 (emphasis added).

As a basis for its holding that both EPA and State approval are required before a revision to a SIP is effective, the *Train* Court relied on 42 U.S.C. § 7410(a)(3)(A) (providing Administrator of EPA shall approve any revision meeting the requirements of 42 U.S.C. § 7410(a)(2) in a SIP after State approval). Nothing in EPA's Emissions Trading Policy Statement which includes the "bubble" concept suggests that an application will be a basis for relieving a polluter from its previous obligations to meet the NAAQS and the schedules for compliance established in the SIPs and any consent decree. On the contrary, EPA's Policy Statement expressly provides that, "These alternatives do not alter existing air

quality requirements." 47 Fed.Reg. at 15076.

The Consent Decree to which Wheeling bound itself acknowledges the possibility that Wheeling would apply for the "bubble" option as an alternative system for meeting the pollutant emission requirements of the Decree and the Act. However, Part XXXI, Paragraph 9 of the Second Amendment specifically provides that Wheeling remains obligated to comply with the requirements of the Consent Decree pending approval of an alternative system. *See* page 1080, *supra.*

A situation almost identical to this case was presented in *United States v. National Steel Corp.*, 767 F.2d 1176 (6th Cir. 1985). National Steel was required by a consent decree to meet specific emission limitations at various facilities at its Great Lakes Steel Plant in accordance with stated compliance schedules. That decree also permitted the steel company to seek an alternative emission reduction option, but provided that the application would not be grounds for delaying the requirements of the consent decree. National Steel filed a "bubble" application, and did not take the steps required under the consent decree in the expectation that its bubble would be approved. The district court imposed penalties that exceeded $5 million pursuant to the provisions of the consent decree. The Court of Appeals affirmed, stating:

> The command of the consent decree was clear; an application for a bubble would not postpone the compliance dates. The agency always indicated that it would hold National to the terms of the consent decree. In the amendment of the consent decree entered into by the parties and approved by the court in August, 1982, both parties acknowledged the continuing liability of National for the accruing penalties.

*Id.* at 1182.

In *National Steel*, the "bubble" application was ultimately disapproved by the EPA. In this case, Wheeling's "bubble" application has not even been approved yet by the West Virginia agency before which it has been pending for more than two years. Moreover, EPA advised Wheeling by letter dated April 23, 1985, that its submission was deficient because it did not constitute a plan for an air pollutant emission control system as required by the Second Amendment. App. at 122–23. Until a revision is approved first by the state agency and then by EPA it is not effective and cannot be the basis of an order relieving it from the compliance deadlines. *See Train v. Natural Resources Defense Council, Inc.*, 421 U.S. at 92, 95 S.Ct. at 1488; *Getty Oil Co. (Eastern Operations) v. Ruckelshaus*, 467 F.2d at 358. *See also* 40 C.F.R. § 51.34 (1986).

Another recent Sixth Circuit case, *United States v. Ford Motor Co.*, 814 F.2d 1099 (6th Cir.1987), provides added support for this conclusion. Ford had failed to comply with the EPA-approved Michigan SIP and instead negotiated a consent decree in state court with the Michigan agencies. Ford then attempted to interpose that consent decree as a defense in the EPA federal enforcement action. The district court accepted Ford's position, but the Sixth Circuit reversed, holding that EPA retains the ultimate authority to approve revisions in SIPs, and that "the original emission limit remains fully enforceable until a revision or variance is approved by both the State and EPA." At 1103. With respect to the effect of the state proceeding, the Sixth Circuit stated:

> We observe at this point that standards for purification of the ambient air simply cannot be set along the boundaries of our 50 states. The winds, of course, recognize no such boundaries. The 50 states of this union compete intensely with one another for industry. As Congress has recognized, if state control of ambient air emissions were final, in short order, major shifts of smoke stack industries to states with the most lenient pure air standards would inevitably take place. Absent final authority in United States EPA, the attainment goals of the Clean Air Act would prove ephemeral.

At 1102.

There is simply no statutory, regulatory, or case authority that supports the district

court's reliance on Wheeling's pending. "bubble" application as a basis for relieving it of the compliance schedule mandated by the statute, the SIP, and the Consent Decree until action on the application is completed. In so holding, the district court erred as a matter of law.

### D.

### *So-Called "Changed Circumstances"*

In the Memorandum Opinion denying EPA's Motion for Reconsideration, the district court relied not only on the pending "bubble" application but also on the following which it denominated as "changed circumstances": "Since entry of the second amendment in July, 1983 Wheeling-Pitt has filed for Chapter 11 bankruptcy, has experienced a 98 day labor strike, and has had a change in management. Losses in 1985 exceed $300 million." App. at 140. Once again we must look to statutory language and Congressional intent to ascertain whether these are permissible bases for relieving Wheeling of its obligation to take action to cease emitting the prohibited pollutants.

██ Congress expressly provided that the automatic stay provisions of the Bankruptcy Code do not apply when the government is seeking to enforce its police or regulatory power. 11 U.S.C. § 362(b)(4) & (5). The legislative history of § 362(b)(4) states that: "where a governmental unit is suing a debtor to stop violation of fraud, *environmental protection*, consumer protection, safety, or similar police or regulatory laws, or attempting to fix damages for violation of such a law, the action or proceeding is not stayed under the automatic stay." H.Rep. No. 595, 95th Cong., 2nd Sess. 343, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5963, 6299 (emphasis added).

In *Penn Terra Ltd. v. Dept. of Environmental Resources*, 733 F.2d 267 (3d Cir. 1984), this court construed § 362(b)(4) & (5) to exempt from the automatic stay an equitable action brought by the state environmental agency against the debtor to correct violations of various state environmental protection statutes and to enforce the terms of a prior consent decree. We held that the state's action sought to force the debtor to rectify harmful environmental hazards and stated,

> No more obvious exercise of the State's power to protect the health, safety, and welfare of the public can be imagined. Indeed, both the Senate and the House committee reports on the Bankruptcy Reform Act explicitly acknowledge environmental protection as a part of the State's police power.

*Id.* at 274 (footnote omitted). *Penn Terra* was referred to by the Supreme Court in *Ohio v. Kovacs*, 469 U.S. 274, 283–84 n. 11, 105 S.Ct. 705, 711 n. 11, 83 L.Ed.2d 649 (1985), where the Court distinguished the case before it, one to enforce a money judgment, from a case like *Penn Terra*, which it approvingly noted for the proposition that "[t]he automatic stay provision does not apply to suits to enforce the regulatory statutes of the State."

The same statutory construction is *a fortiori* applicable to EPA's regulatory actions to force compliance by a debtor with federal environmental laws. In *In re Commonwealth Oil Refining Co.*, 805 F.2d 1175 (5th Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 3228, 96 L.Ed.2d — (1987), the court held that EPA was entitled to enforce its order requiring compliance by a debtor in Chapter 11 proceedings with the provisions of the Resource Conservation and Recovery Act of 1976 (RCRA), 42 U.S.C. §§ 6901–6991. The court held that "EPA has the authority to enforce its regulatory power ... to require [the debtor] to comply with the federal and state environmental laws and regulations," *id.,* at 1183, that "EPA's actions are not an attempt to enforce a money judgment, proscribed by [11 U.S.C.] § 362(b)(5), notwithstanding the fact that [the debtor] will be forced to expend funds in order to comply," *id.* at 1184, and that "the police and regulatory exceptions [to the automatic stay] do not depend on a showing of imminent and identifiable harm or urgent public necessity." *Id.* See also *Cournoyer v. Town of Lincoln*, 790 F.2d 971 (1st Cir.1986) (town's action in state court to enforce its zoning ordinance by removing inventory of used

truck parts from land of debtor in Chapter 11 proceedings and selling the inventory is pursuant to its "police or regulatory power" and hence exempted from the automatic stay).

It follows that Wheeling's pending Chapter 11 status is not a basis on which the district court could have permissibly relied for its order relieving Wheeling of its obligation to comply with the relevant environmental statute, regulations and consent decree provisions.

▌ Likewise, economic infeasibility is not a proper basis for staying compliance with the Clean Air Act. In *Union Electric Co. v. EPA*, 427 U.S. at 246, 96 S.Ct. at 2520, the Court rejected the argument that the Administrator had the authority to disapprove a SIP on the basis of technological or economic infeasibility. The Supreme Court stated:

> [T]he 1970 Amendments to the Clean Air Act were a drastic remedy to what was perceived as a serious and otherwise uncheckable problem of air pollution. The Amendments place the primary responsibility for formulating pollution control strategies on the States, but nonetheless subject the States to strict minimum compliance requirements. These requirements are of a "technology-forcing character," *Train v. NRDC*, [421 U.S. at 91, 95 S.Ct. at 1487,] and are expressly designed to force regulated sources to develop pollution control devices that might at the time appear to be economically or technologically infeasible.

*Id.* at 256–57, 96 S.Ct. at 2525. The Court stated further:

> [The Act's] three-year deadline for achieving primary air quality standards is central to the Amendment's regulatory scheme and, as both the language and the legislative history of the requirement make clear, it leaves no room for claims of technological or economic infeasibility.

*Id.* at 258, 96 S.Ct. at 2526.

The Court's holding in *Union Electric* was specifically noted and approved by Congress when it enacted the 1977 amendments. The House Report states:

> The dispute over the availability of variances, revisions, postponements and enforcement orders and their relationship to the attainment and maintenance of air quality standards ... relates to two questions. The first is whether or not the Administrator is authorized (or required) to disapprove a State plan, because it is "economically or technologically infeasible" or because "it does not reflect the most cost-effective system" for attaining and maintaining the national ambient air quality standards. That question has now been settled by the Supreme Court in [*Union Electric*], and the Committee takes no issue with the holding of that case.

H.R.Rep. No. 294, 95th Cong., 1st Sess. 56, *reprinted in* 1977 U.S. Code Cong. & Admin. News 1077, 1134.

Thus, the district court's order improperly considered Wheeling's economic straits and its recent losses as a basis for extending the compliance requirement beyond the December 31, 1985, deadline. It should be noted in this respect that the original compliance order requiring expenditures for the emission control system was entered in 1979. Wheeling was aware of the need to make the expenditures long before its recent economic problems.

Moreover, as indicated by the legislative history previously referred to, Congress was aware of the financial problems the steel industry was facing, but in enacting SICEA it intended to give the steel companies only a limited time during which they could delay compliance with the Clean Air Act in order to modernize their plants. *See* H.R. Rep. No 121, 97th Cong., 1st Sess. 1, *reprinted in* 1981 U.S. Code Cong. & Admin. News at 56.

The steel companies were required during the "stretch out" period "to make continual progress toward achieving clean air requirements by 1985, and to continue the installation of pollution control technology on all existing sources." H.R.Rep. No. 121, 97th Cong., 1st Sess. 1–2, *reprinted in* 1981 U.S. Code Cong. & Admin. News at 56–57. Thus, knowing of the financial problems the steel companies were facing, Congress intended that consent decrees entered or modified by SICEA provide for timely installation of pollution control

equipment. Wheeling's current financial problems are neither so new or unforeseen as to warrant modifying the consent decree, particularly in the face of clear legislative intent to the contrary.

■ The district court's Memorandum Opinion also states that "EPA's position would, in all probability, force the closing of the sinter plant." App. at 133. Wheeling concedes before this court that "Operation of the sinter plant is not ... an essential element of [Wheeling's] steel production facilities." Appellee's Brief at 11. While continued operation of steel facilities may advance a state's economic interest, the Clean Air Act reflects a congressional policy decision that removal of pollutants from the air which endanger the lives and health of the populace is a more compelling public interest. The district court was not authorized to impose its own balancing of policy over that of Congress. In this respect, the language used by the Supreme Court in *TVA v. Hill*, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978), where it affirmed an injunction against the operation of the $100 million Tellico Dam because it would lead to the extinction of the snail darter, is instructive:

> Here we are urged to view the Endangered Species Act "reasonably," and hence shape a remedy "that accords with some modicum of common sense and the public weal." ... But is that our function? We have no expert knowledge on the subject of endangered species, much less do we have a mandate from the people to strike a balance of equities on the side of the Tellico Dam. Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities, thereby adopting a policy which it described as institutionalized caution.

*Id.* at 194, 98 S.Ct. at 2302. If the courts must defer to Congress' judgment as to the need to preserve the snail darter, surely the district court must defer to Congress' decision to require compliance with the emission limitations no later than December 31, 1985.

■ The district court also referred to the 98 day strike as a "changed circum-

stance" in its Memorandum Opinion although it never explained the legal relevance. The Clean Air Act and amendments thereto contain no *force majeure* exception. Nonetheless, EPA concedes the applicability of such an exception and the Second Amendment to the Consent Decree embodies such an exception for "the occurrence of, and to the extent of, any delay caused by circumstances entirely beyond [Wheeling's] control." App. at 68. In such an instance, Wheeling is required to notify the Court, EPA and the affected states in writing, identifying the cause and giving other details. App. at 68–69. Wheeling's Motion to Amend or Stay Certain Provisions of the Consent Decree referred to three notices of *force majeure*. Supp.App. at 28. None of those notices refer to the Sinter Plant, although some do refer to the effect of the strike on other compliance deadlines. Having failed to utilize the *force majeure* exception of the Consent Decree as to the Sinter Plant, Wheeling cannot now rely on the effect of the strike to excuse its non-compliance.

Although a consent decree is a judicial act, it has many of the attributes of a contract voluntarily undertaken, *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 236–37, 95 S.Ct. 926, 934–35, 43 L.Ed.2d 148 (1975); *United States Steel Corp. v. Fraternal Ass'n of Steel Haulers*, 601 F.2d 1269, 1274 (3d Cir.1979), and a party to a consent decree, having made a "free, calculated and deliberate choice to submit to an agreed upon decree rather than seek a more favorable litigated judgment," bears a burden which "is perhaps even more formidable than had they litigated and lost." *Id.* "Nothing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed after years of litigation with the consent of all concerned." *United States v. Swift & Co.*, 286 U.S. 106, 119, 52 S.Ct. 460, 464, 76 L.Ed. 999 (1932). It follows that the district court abused its discretion in basing its order on Wheeling's Chapter 11 filing, its economic losses, the possibility that the Sinter Plant would be closed, and the strike.

## III.

### Conclusion

For the reasons set forth, we conclude that the district court erred as a matter of law and abused its discretion in entering the order amending the Consent Decree as to the Sinter Plant and staying Wheeling's obligation to comply with the deadlines set forth therein. At oral argument, EPA suggested that Wheeling's defaults are so clear that this court should entertain EPA's contempt motion and motion for summary judgment. Although the basis for EPA's impatience is evident from the record, we are unwilling to pretermit the district court's role in reconsidering these motions upon remand. We are confident that the district court will recognize the sense of urgency embodied in this opinion and will act accordingly.

The orders of the district court of December 23, 1985, and May 21, 1986, will be reversed insofar as they amend and stay the provisions applicable to the Sinter Plant in the Second Amendment to the Consent Decree. The case will be remanded to the district court for further proceedings consistent with this opinion. The mandate will issue forthwith.