**UNITED STATES of America,
Appellant,**

v.

**WHEELING–PITTSBURGH STEEL
CORPORATION, and Monessen, Inc. (a
wholly-owned subsidiary of Sharon
Steel Corporation, Appellee.**

No. 88–3447.

United States Court of Appeals,
Third Circuit.

Argued Sept. 7, 1988.

Decided Oct. 12, 1988.

Roger J. Marzulla, Asst. Atty. Gen., Robert L. Klarquist, David P. Hackett, Robert R. Kuehn, Jacques B. Gelin (argued), Dept. of Justice, Land & Natural Resources Div., Washington, D.C., James M. Baker, Sr. Asst. Regional Counsel, U.S. E.P.A., Region III, Philadelphia, Pa., for appellant.

Lawrence A. Demase (argued), Edward Gerjuoy, Rose, Schmidt, Hasley & DiSalle, Leonard A. Costa, Jr., Dickie, McCamey & Chilcote, P.C., Pittsburgh, Pa., for appellees.

Carl B. Frankel, Associate General Counsel, Paul Whitehead, Asst. General Counsel, United Steelworkers of America, Pittsburgh, Pa., Bernard Kleiman, Chicago, Ill., for amicus curiae United Steelworkers of America, AFL–CIO and its Local 2698.

Fried, Frank, Harris, Shriver & Jacobson, New York City, Stonecipher, Cunningham, Beard & Schmitt, Pittsburgh, Pa., for amicus curiae Unsecured Creditors of Sharon Steel Corp.

Before BECKER, HUTCHINSON and COWEN, Circuit Judges.

## OPINION OF THE COURT

BECKER, Circuit Judge.

This opinion addresses a motion by the United States, on behalf of the Environmental Protection Agency, for summary reversal of an order of the district court amending a consent decree. The decree, entered in 1979 and subsequently amended, required appellee Wheeling–Pittsburgh Steel Corporation (Wheeling–Pitt), *inter alia*, to install a sulfur dioxide emission control system in its Monessen (Pa.) coke plant by June 30, 1986, or shut down the plant. The desulfurization equipment was not installed by June 30, 1986, and the plant was shut down and has been on "hot idle" since that time to preserve the coke ovens. The recent amendment was sought by Wheeling–Pitt and by intervenor Sharon Steel Corporation to whom Wheeling–Pitt sold the plant, to enable Sharon to start-up the coke ovens before installing the desulfurization equipment.

The district court amended the consent decree to permit the restart prior to installation primarily because of its concern about the grave condition of the economically depressed Mon Valley. The EPA, citing deleterious effects upon the environment of a restart before installation, objected on the grounds that in *United States v.*

*Wheeling–Pittsburgh Steel Corp.*, 818 F.2d 1077, 1086–88 (3d Cir.1987) (hereinafter *"Wheeling–Pitt I"*), a decision addressing the same consent decree though affecting a different plant, we expressly held such economic considerations improper. Although summary reversal is reserved for clear cases, *see* Third Cir. Int. Op. P. Ch. 17, this is such a case, for the district court's action is in clear contravention of our opinion in *Wheeling–Pitt I.* We therefore will summarily reverse the order of the district court amending the consent decree. The stay of the district court's order, entered on August 11, 1988, will be vacated as moot.

## I.

The original consent decree was entered into among EPA, Wheeling–Pitt, and the states of Pennsylvania, Ohio and West Virginia. It was approved on March 19, 1979, and required installation of the desulfurization equipment by March 1, 1982. The consent decree further required Wheeling–Pitt to demonstrate compliance with the Pennsylvania State Implementation Plan ("SIP") by June 1, 1982. On April 20, 1982, the district court approved amendments to the consent decree, which pushed the respective installation and compliance deadlines to March 1, 1985 and June 1, 1985. On May 13, 1983, in response to Wheeling–Pitt's application to the EPA under the Steel Industry Compliance Extension Act ("SICEA") for relief from the Clean Air Act's December 31, 1982, compliance deadline, 42 U.S.C. § 7502(a)(1) (1982), the EPA Administrator agreed to a further amendment of the consent decree, entitled the Second Amendment to Consent Decree ("Second Amendment").[1] The Second Amendment, which was approved by the district court on July 15, 1983, incorporated Wheeling–Pitt's previously agreed-upon compliance schedule for the Monessen coke ovens, requiring installation of the pollution control equipment and compliance with the Pennsylvania SIP by June 1, 1985.

Following the onset of a labor strike, Wheeling–Pitt sought an extension of the March 1, 1985, and June 1, 1985, deadlines, arguing to the district court that the strike constituted a *force majeure* circumstance under the terms of the consent decree. The district court agreed with Wheeling–Pitt and extended the installation deadline to June 30, 1986, and the compliance deadline to August 31, 1986. EPA and Wheeling–Pitt then negotiated an amendment to the Second Amendment, a provision of which required Wheeling–Pitt to shut down the Monessen coke plant temporarily if installation and operation of the desulfurization equipment did not occur by June 30, 1986. On June 23, 1986, Wheeling–Pitt sought a further extension, which the district court denied. Upon its failure to comply with the district court's extension of the Second Amendment's deadline, the Monessen coke plant was forced to cease producing coke on June 28, 1986. Since then, Wheeling–Pitt has not produced coke at Monessen, but, as noted above, has maintained the coke plant at "hot idle" to prevent deterioration of the ovens.

On May 6, 1988, Wheeling–Pitt and Sharon, a potential purchaser of the Monessen coke ovens, filed a joint motion with the district court to amend the decree to permit Sharon to start the coke ovens before installing the desulfurization equipment. Sharon argued, among other things, that it should not be required to bear the consequences of Wheeling–Pitt's failure to install the equipment; that Sharon needed to produce coke at Monessen in the economically depressed Mon Valley to fuel its steel mill in Farrell, Pennsylvania (in the economically depressed Shenango Valley); that Sharon wished to take advantage of an apparently short-term increase in demand for steel so that it could generate cash to finance its purchase of the Monessen plant; and that a permanent loss of steel industry assets and jobs would result if an immediate start-up was not permitted, because no potential buyer would purchase the Monessen plant otherwise.

---

**1.** The pertinent statutory scheme, dealing with the Clean Air Act, SIPs, and SICEA, is described in detail in *Wheeling–Pitt I.*

Both the United States and Pennsylvania opposed the motion. On May 10, 1988, the court held a thirty-five minute status conference at which the parties briefly presented their views.[2] The court declared its intention to grant the steel companies' motion at the conference, stating, "I have decided that I do have the right to amend this decree, that there are sufficient changed circumstances, and that under the circumstances I am going to amend." Status Conference Transcript at 22.

The district court granted the steel companies' motion and issued a memorandum opinion, citing three grounds. First, it reasoned that Wheeling–Pitt's decision not to install the desulfurization equipment was beyond Sharon's control. Second, Sharon's "situation" was said to be unforeseen when the parties agreed upon the consent decree. Third, failure to amend the consent decree would "work a grievous wrong to Sharon, to Wheeling–Pittsburgh, to the creditors of both in the bankruptcy proceedings, and most importantly, to the people of the Mon Valley." Dist. Ct. mem. op. at 3. The order, filed on May 18, 1988, amended the decree, and allowed Sharon to start the coke ovens immediately upon their taking possession and before installation of the desulfurization equipment, so long as the equipment was installed within 180 calendar days.

On June 23, 1988, Sharon's purchase of the Monessen coke ovens was concluded and Sharon took possession of the plant. On July 8, 1988, EPA applied to the district court for a stay of its May 18, 1988, order. On July 27, 1988, the district court denied EPA's request. On August 11, 1988, this Court granted EPA's motion for a stay. EPA seeks summary reversal of the district court's order largely on the ground that the May 18, 1988, amendment was prohibited by this Court's decision in *Wheeling–Pitt I.* In *Wheeling–Pitt I,* which also involved a motion for summary

reversal, we declared that the standard of review is whether the district court abused its discretion or erred as a matter of law in granting the amendment to the consent decree. *Wheeling–Pitt I,* 818 F.2d at 1089.

## II.

In *Wheeling–Pitt I,* the consent decree which is the subject of this appeal was also under consideration. In that case, we reversed the district court's grant of Wheeling–Pitt's motion to amend the consent decree, which also required that Wheeling–Pitt install pollution control equipment at its Follansbee, West Virginia, sinter plant by December 31, 1985. The amendment provided no set compliance date, but instead required approval by the West Virginia Air Pollution Control Commission of an alternative proposal by Wheeling–Pitt. We held in *Wheeling–Pitt I* that the district court had abused its discretion when it allowed amendment of the consent decree for reasons of Wheeling–Pitt's economic losses, the potential closing of the plant and because of a labor strike.

Our decision in *Wheeling–Pitt I* provides guidance in this case in three respects. First, *Wheeling–Pitt I* declared the standard for amendment of a consent decree: " 'Nothing less than a *clear showing of grievous wrong evoked by new and unforeseen conditions* would lead us to change what was decreed after years of litigation with the consent of all concerned.' " *Id.* at 1088 (quoting *United States v. Swift & Co.,* 286 U.S. 106, 119, 52 S.Ct. 460, 464, 76 L.Ed. 999 (1932)) (emphasis added).

Second, *Wheeling–Pitt I* determined the limits on the district court's equitable discretion to extend compliance dates beyond those set by Congress in SICEA:

It is evident ... from the language of the statute and its legislative history that Congress placed great significance on

**2.** Although neither side asserts on this appeal that the district court failed to follow proper procedures, Third Circuit precedent would seem to indicate that a failure to hold an evidentiary hearing before amending a consent decree could result in reversible error. *See Delaware*

*Valley Citizens' Council v. Pennsylvania,* 674 F.2d 976, 981 (3d Cir.1982) ("a district court must hold an evidentiary hearing before modifying a consent decree in such a manner as to remove requirements previously imposed").

the compliance dates and intended to limit, if not entirely eliminate, the district court's equitable discretion to extend compliance.

*Id.* at 1084.

Third, *Wheeling–Pitt I* articulated those changed circumstances that would *not* justify amendment of a consent decree. The opinion made it very clear that "economic infeasibility is not a proper basis for staying compliance with the Clean Air Act." *Id.* at 1087. Correlatively, we held that the potential closing of a plant is not an adequate justification for amendment.

> While continued operation of steel facilities may advance a state's economic interest, the Clean Air Act reflects a congressional policy decision that removal of pollutants from the air which endanger the lives and health of the populace is a more compelling public interest.

*Id.* at 1088.

To summarize, *Wheeling–Pitt I* placed severe restrictions on the ability of the district court to amend consent decrees, and this consent decree in particular; unequivocally forbade amendment on economic or financial grounds; and determined that grievous wrong and unforeseen circumstances are the minimal requirements before amendment may be properly allowed. We are, of course, bound by those determinations.

The district court provided three justifications for the amendment, none of which are sufficient under these standards. First, the court stated that "Wheeling–Pittsburgh's decision not to install air pollution control equipment at the Monessen coke plant is a circumstance entirely beyond Sharon's control." Dist. Ct. mem. op. at 3. As EPA points out, Sharon is not the victim of circumstances that this statement would depict. The consent decree states

that the provisions of the decree "shall apply and be binding upon the defendant, its … successors and assigns, and all persons, firms and corporations acting by, through, under or for it." Second Amendment at Part II, Para. 2. From the beginning of its involvement with the Monessen plant, Sharon has had full knowledge of the requirements of the consent decree [3] and of the existing shutdown status of the plant. *See also, infra*, n. 5.

Even if we were to grant that Sharon could not control Wheeling–Pitt's actions in failing to install the pollution control equipment before Sharon took possession. Sharon has had full control over its decision whether to buy the Monessen coke plant and therefore whether to assume the responsibilities imposed by the consent decree. If Sharon did not obtain from Wheeling–Pitt the necessary concessions in cost or in the terms of the sale that would justify taking on the obligations of the consent decree, its complaint is properly with Wheeling–Pitt, not with the consent decree.[4] The district court abused its discretion when it permitted amendment on this ground.

Second, the district court concluded that "[t]he situation in which Sharon finds itself is new and was unforeseen at the time the parties entered into the consent decree." Dist. Ct. mem. op. at 3. The court did not elaborate on what it meant by "the situation in which Sharon finds itself." EPA suggests that the situation supposedly unforeseen was the sale of the coke plant. This interpretation is supported by statements made at the status conference by Wheeling–Pitt's attorney that "it was not contemplated that Wheeling–Pittsburgh was going to sell [Monessen]." Status Conference Transcript at 5. As EPA points out, however, the consent decree

---

**3.** At the status conference, Wheeling–Pitt's attorney stated that Sharon, as well as two other bidders, was "aware of the consent decree." Status Conference Transcript at 5.

**4.** One bidder, B–Mac, conditioned its bid on whether the court or the EPA approved operation of the coke ovens before installation of the pollution control equipment. If neither the court's nor the EPA's permission was granted,

B–Mac had the right to "back out of the deal." *Id.* at 4. Obviously, this option was available to Sharon, but Sharon chose another avenue for protecting its interests. The Agreement of Sale provides for a reduction in the purchase price in the event Sharon was forced to cease operating the plant, because the district court's order was stayed or overturned.

clearly provided that Wheeling–Pitt's "successors and assigns" were bound by the agreement and therefore Sharon's situation as buyer of the coke ovens was not unforeseen by the parties entering into the consent decree.

Sharon's representative provided a somewhat more complex account of the supposed changed circumstances: "The consent decree did not contemplate a situation where the coke ovens would be idle for a period of six to eight months . . . nor that the compliance schedule which Wheeling–Pitt had agreed to would not be complied with and a transfer would be made in that circumstance." *Id.* at 13. The circumstance of Wheeling–Pitt's failure to comply and subsequent shutdown of the ovens, however, was considered by the parties. EPA and Wheeling–Pitt negotiated an amendment to the Second Amendment, which included an explicit provision requiring Wheeling–Pitt to temporarily shutdown the Monessen plant if it had not installed and begun operation of the desulfurization equipment by June 30, 1986. Thus, failure to comply with the consent decree requirement of installation and shutdown of the plant were both contemplated by the parties to the consent decree. The terms of the consent decree also make it clear that a sale of Wheeling–Pitt's holdings was contemplated. The mere fact of their tandem occurrence does not constitute changed circumstances sufficient to justify amendment under *Wheeling–Pitt I.*

Third, the district court justified the amendment by stating that failure to amend the consent decree would "work a grievous wrong to Sharon, to Wheeling–Pittsburgh, to the creditors of both in the bankruptcy proceedings, and most importantly, to the people of the Mon Valley." Dist. Ct. mem. op. at 3. We address each of the asserted wrongs individually, once again drawing upon the statements made at the status conference to clarify the court's meaning.

Sharon's representative asserted that Sharon was having difficulty acquiring coke, which was needed to keep their blast furnaces operating. Sharon also asserted an interest in employment in the Mon Valley. Thus, Sharon's principal arguments at the status conference were economic in nature. Wheeling–Pitt's representative argued that there was a "serious risk that there will be no buyer" absent approval of the amendment and that Wheeling–Pitt could not afford to continue to maintain the ovens and therefore could lose the value of their asset. Status Conference Transcript at 5. Thus, Wheeling–Pitt's asserted grievous wrong was also solely financial.

The Wheeling–Pitt creditors' representative asserted that "the creditors committee has not looked at this purely as an economic issue. It's looked as [sic] it as what's the right thing for the most people." The creditors' representative did not elaborate, except to assert that a completely shutdown coke plant would be a "bigger environmental problem." *Id.* at 20–21. Absent explanation of the "right thing" or the "environmental problem," we cannot determine if a grievous wrong has occurred or even what grievous wrong is being charged by the creditors.

Finally, the court asserted that "the people of the Mon Valley" would suffer a grievous wrong absent the amendment. At the status conference, the Deputy Secretary of Commerce for the Commonwealth, Mr. Rhoades, and the Representative of Monessen in the Pennsylvania Legislature, Mr. Manderino (also the Majority Leader of the Pennsylvania House), asserted the interests of the residents of the Mon Valley. Mr. Rhoades stressed that the governor and his administration "[felt] very strongly about the viability of Sharon Steel. . . . [and] that the Administration regards economic potential of utilizing these coke batteries by Sharon Steel to be significant." *Id.* at 10. Mr. Manderino asserted that the environment is important, but that the "people in our Western Pennsylvania economy, devastated over the last several years, can stand some compassion, too." *Id.* at 19. In short, both argued strongly that the state's economic interests and the Mon Valley's economic needs should outweigh the requirements of the Clean Air Act.

While we cannot help but be moved by the plight of the residents of the Mon Val-

ley, where unemployment is high, all of the considerations put forth by the steel companies in favor of amending the consent decree are the very considerations declared by this Court in *Wheeling–Pitt I* to be insufficient to justify further delay in compliance with the Clean Air Act. As noted above, both Sharon's and Wheeling–Pitt's justifications are economic in nature. And Mr. Rhoades' and Mr. Manderino's entreaties assert no more than that the state's and the Mon Valley's economic interests should prevail over the goals of the Clean Air Act. Yet, in *Wheeling–Pitt I*, we stated that the district court erred, because it "improperly considered Wheeling's economic straits," 818 F.2d at 1087, and that "removal of pollutants from the air" was a "more compelling public interest" than "a state's economic interest." *Id.* at 1088.

In sum, no justifications were provided by the district court that satisfy the standard set forth in *Wheeling–Pitt I*. The district court plainly abused its discretion and clearly erred as a matter of law by relying on the steel companies' and the state's economic interests to overcome the deadlines set by the consent decree pursuant to the Clean Air Act. The order amending the consent decree will be summarily reversed.[5] Our order of August 11, 1988, staying the district court's order, will be vacated as moot.

---

5. Following the district court's May 18, 1988, amendment of the consent decree and in its papers filed with this Court, Sharon and Wheeling–Pitt have asserted a new justification for the amendment. They claim that starting the idled coke ovens simultaneously with the desulfurization equipment would be technically imprudent. Because simultaneous start-up would apparently be potentially dangerous for both, they argue that they should be permitted to start the coke ovens before installing the pollution control equipment. The government responds, and Wheeling–Pitt and Sharon concede, that despite potential difficulties in simultaneous start-up, the desulfurization equipment can still be installed before starting the coke ovens. Moreover, once installation is completed, EPA has stated its willingness to engage in negotiations concerning when the pollution control equipment must be put into operation. Indeed we have been informed that over the past two weeks Sharon and the United States have had discussions about resolving the technical issues relating to start-up of the desulfurization system. We have been further informed that the United States will send a letter to Sharon setting forth the issues that the government believes should be addressed by Sharon's technical advisors and that a meeting between technical representatives of Sharon and EPA is tentatively scheduled for October 14. We hope that the technical issues relating to the desulfurization system can and will be resolved by the parties.

We take no stand on this issue here, because the record upon which the district court's order stands does not at any point refer to it. While this Court may recognize a change in legal theory, it permits such a change only if the record supports the new theory. *See Jurinko v. Edwin L. Wiegand Co.*, 477 F.2d 1038, 1045 (3d Cir. 1973).