767 F.2d 1176
 22 ERC 2250, 15 Envtl. L. Rep. 20,678
 UNITED STATES of America, Plaintiff-Appellee,
and
Wayne County Department of Health, Air Pollution Control
Division, and Frank J. Kelley, Attorney General For the
State of Michigan, Frank J. Kelley ex. rel. Michigan Natural
Resources Commission, Michigan Air Pollution Control
Commission and Howard A. Tanner, Director of the Michigan
Department of Natural Resources, Natural Resources Defense
Council, Dennis Piper, Intervenors-Appellees,
v.
NATIONAL STEEL CORPORATION, Defendant-Appellant.
 No. 83-1600.
 United States Court of Appeals,
Sixth Circuit.
 Argued Aug. 21, 1984.
Decided July 26, 1985.
 
 Douglas H. West, Hill, Lewis, Adams, Goodrich & Tait, Detroit, Mich., Clyde W. Armstrong, Kevin Abbott, Chester R. Babst, III (argued), Dean A. Calland, Preston T. Scott, Thorp, Reed and Armstrong, Washington, D.C., for defendant-appellant.
 Dennis Piper, Robert H. Abrams, Natural Resources Defense Counsel, Ann Arbor, Mich., John Barker (argued), George Lawrence, Environmental Enforcement Service, Washington, D.C., Francis L. Zebot, Asst. U.S. Atty., Detroit, Mich., Peter Veeder, Thorp, Reed & Armstrong, Pittsburgh, Pa., Stuart Freeman, Asst. Atty. Gen., Environmental Protection Div., Lansing, Mich., William C. Achinger, Steven E. Chester, Joseph B. Klein, Wayne County Dept. of Health, Air Pollution Control Div., Detroit, Mich., Peter J. Kelly, U.S. E.P.A., Chicago, Ill., Michael Alushin, Andrew M. Jackson, Office of Gen. Counsel, U.S. E.P.A., Washington, D.C., David G. Hawkins (argued), Natural Resources Defense Council, Washington, D.C., Stephen Schuesler (argued), Asst. Atty. Gen., L. Caruso, Lansing, Mich., for intervenors-appellees.
 Before ENGEL and MERRITT, Circuit Judges, and WISEMAN, District Judge.*
 ENGEL, Circuit Judge.
 
 
 1
 National Steel Corporation (National) appeals from an order of the United States District Court for the Eastern District of Michigan which required National to pay penalties in excess of $5 million for violating a consent decree entered into between National, the United States, and various intervenors in settlement of an air pollution action brought by the United States against National. National appeals from the order. We affirm in part, reverse in part, and remand for modification of the final order consistent with this opinion.
 
 
 2
 On August 14, 1979, the United States filed a complaint against National pursuant to section 113(b) of the Federal Clean Air Act, 42 U.S.C. Sec. 7413(b), alleging that several facilities at National's Great Lakes Steel Plant, located near Detroit, were not in compliance with certain emission limitation requirements promulgated by the State of Michigan pursuant to the Clean Air Act. The parties entered into an extensive consent decree which settled all of the issues raised in the complaint. The district court approved the consent decree on March 31, 1981.
 
 
 3
 In April of 1983, the United States filed a motion in the district court alleging that National had violated the consent decree. The district court agreed and found National liable for the penalties stipulated therein. National appeals from the district court's order contending that the imposition of penalties violated the due process clause of the Fifth Amendment and the terms of the consent decree. In addition, National contends that the district court failed to limit the scope of the stipulated penalties as required under Paragraph V.C.3 of the decree.
 
 I.
 
 4
 The consent decree required National to meet specific emission limitations at various facilities at the Great Lakes Steel Plant in accordance with stated compliance schedules. National agreed to install pollution abatement equipment on its No. 2 Basic Oxygen Furnace according to the following schedule:
 
 
 5
 (a) December 15, 1980 Issue purchase orders
 
 
 6
 (b) August 31, 1981 Start construction
 
 
 7
 (c) August 15, 1982 Complete installation of hooding and control device
 
 
 8
 (d) November 15, 1982 Achieve and demonstrate compliance with the emission limitations specified in Paragraphs VII A 1 and 2
 
 
 9
 The consent decree set forth stipulated amounts to be paid by National for failing to meet the construction schedule. Paragraph V.A.1 provided for a $1,000 per day penalty for the first ten days that an interim date in the construction schedule was not met, $2,000 per day for the next ten days, $3,500 per day for the next ten days, and $5,000 per day thereafter. Paragraph V.A.2 provided that if National fails to meet a final date in a schedule for the construction or installation of pollution control equipment on a facility, "it shall be liable for a stipulated amount of $7,500 per day for each facility for each day such failure continues. Any stipulated liability under this subparagraph will be subsequently forgiven if [National] meets the emission limitations by the attainment date set forth in the schedule."
 
 
 10
 Paragraph V.B dealt with compliance with emission limitations and provided that if National should fail to meet the final attainment date set forth in a schedule for meeting emission limitations, "[National] shall pay a stipulated amount of $7,500 per day for each day [National] operates the facility without a demonstration that it meets the applicable emission limitations...." Paragraph V.C stated important limitations on the amount of stipulated penalties National would have to pay. Paragraph V.C provided in relevant part:
 
 C. Exclusions:
 
 11
 * * *
 
 
 12
 * * *
 
 
 13
 2. [National] shall not pay stipulated amounts for failure to meet emission limitations at a facility if it is paying stipulated amounts for failure to meet construction or installation schedules at the same facility.
 
 
 14
 3. If [National] fails to demonstrate compliance with an applicable emission limitation its obligation to pay under this paragraph shall cease 180 days after the effective date of the limitation.
 
 
 15
 Paragraph V.D provided that the "provisions of Part B paragraph V ..., including the exclusions in paragraph V C 1 and 2 above shall not be construed to limit any other remedies available to Plaintiff for violation of this Decree or of other provisions of law." The consent decree permitted National to seek an alternate emission reduction option for any facility covered by the decree, but required that the option be sought "in compliance with the Clean Air Act, State law and County law." The decree stated "that an application for such an option shall not be grounds for delaying the requirements of this Decree."
 
 
 16
 National sought one type of alternate emission reduction option that is popularly referred to as a "bubble." A bubble is an air pollution control concept that looks at a group of pollution-emitting sources and the group's emissions as a whole rather than focusing on each individual emission source. Under a bubble, an emission limit for one pollution source is relaxed, while a limit for another source is made more stringent, so that the resulting pollution from the two sources remains the same. The United States Environmental Protection Agency (EPA) allows states to bubble pollution sources. In Chevron, USA v. National Resources Defense Council, Inc., --- U.S. ----, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the Supreme Court upheld the EPA regulation allowing states to bubble pollution sources stating that it was based upon a permissible construction of the Clean Air Act. Under National's proposed bubble, it would not be required to install the pollution control equipment on its No. 2 Basic Oxygen Furnace, but instead would further limit emissions from its Electric Arc Furnace Shop and plant roadways.
 
 
 17
 National did not start to install the emission controls at the No. 2 Basic Oxygen Furnace on August 31, 1981 as required by the consent decree. National took no steps toward construction of the emission controls in the expectation that its bubble would be approved and would thus satisfy the requirements of the consent decree. The bubble, however, was not approved. By the time of oral argument before us, further efforts to obtain approval of the bubble had been abandoned, and National had finally brought itself into compliance with the emission limitations for the No. 2 Basic Oxygen Furnace.
 
 
 18
 In April of 1983, the United States sought payment by National of the stipulated amounts set forth in the consent decree for National's failure to install the emission controls at the No. 2 Basic Oxygen Furnace. National's position in the district court and in this court has been that the EPA encouraged National to delay the performance required by the consent decree by suggesting that approval of the bubble application was soon forthcoming. National contends that to impose the penalties of the consent decree in these circumstances would violate the due process clause of the Fifth Amendment and is contrary to the terms of the consent decree.
 
 
 19
 The district court, however, found that there had been no showing that the EPA's activities were unreasonable under the circumstances. The court held that National had "made a business decision to risk the penalties inherent in violation of th[e] Consent Decree on the gamble that either EPA would approve the alternative plan it had in mind, or that it could force EPA to do so by eliciting a set of confused and mixed signals from the EPA." The district court found National to have violated the consent decree and required National to pay $380,000 plus $7,500 for each day from August 16, 1982 until National completed installation and demonstrated compliance with the emission limitations. Total penalties exceeded $5 million.
 
 II.
 
 20
 The district court found that National had made a business decision to risk the penalties inherent in violating the consent decree on the gamble that the EPA would approve the bubble. The district court's findings of fact may not be set aside unless clearly erroneous. Fed.R.Civ.P. 52(a). A finding is clearly erroneous when such finding is without substantial evidence in the record to support it. We hold that the district court's findings of fact are supported by substantial evidence in the record.
 
 
 21
 The consent decree permitted National to seek a bubble instead of installing pollution control equipment at the No. 2 Basic Oxygen Furnace. The consent decree also provided that an application for a bubble would not be grounds for delaying the requirements of the consent decree. Hence, National knew or should have known, since it was a party to the consent decree, that it was required to go forward with the installation of the pollution control equipment at the No. 2 Basic Oxygen Furnace while the bubble application was pending or face the consequences clearly spelled out in the consent decree. National, however, had a great incentive to seek a bubble while foregoing installation of pollution control equipment at the No. 2 Basic Oxygen Furnace.
 
 
 22
 According to National's calculations, the proposed bubble would save National $16 million in capital costs and $2 million in annual operating costs. These savings flow directly from National not having to install the pollution control equipment at the No. 2 Basic Oxygen Furnace. In addition, if the bubble was approved by the attainment date, all stipulated penalties for failure to meet construction deadlines would be forgiven. The record supports the trial judge's conclusion that National initially assumed the risk of delaying construction.
 
 
 23
 The consent decree provided that National would start construction of the pollution abatement equipment at the No. 2 Basic Oxygen Furnace by August 31, 1981. National did not begin the bubble application process until August of 1981 when it met with representatives of the State of Michigan. National did not start construction on August 31, 1981. Instead, on September 4, 1981, it sent a letter to the EPA stating its desire to seek a bubble instead of installing the pollution abatement equipment. While National claims to have commenced work with the State and Wayne County well before that date, EPA claims its first knowledge of National's attempt to bubble came September 4, 1981. National then proceeded to cancel its purchase orders for the equipment. At this time, National had no assurance that its bubble application would be approved or that approval or disapproval would be soon forthcoming. In addition, approximately two months after National submitted the bubble application to the EPA, the EPA indicated that its preliminarly analysis of the bubble application was negative. Notwithstanding the negative analysis, National proceeded with the bubble application and did not seek to install the pollution equipment as required by the consent decree.
 
 
 24
 National contends that the EPA subsequently misled it throughout 1982 that approval of the bubble application was soon forthcoming. National contends that had it known of the possible technical objections to its bubble that it would not have risked exposure to the stipulated penalties while the EPA conducted its review of the bubble application.
 
 
 25
 National asserts, as stated in the affidavit of Ralph Purdy, Vice President of Environmental Control For National, that in early January of 1982, EPA's Deputy Associate Administrator for Enforcement Policy advised that the bubble application would be easy to approve. Subsequently, the EPA told National that a formal response to the application would be soon forthcoming and that it was proceeding positively. Later in January, the regional office of the EPA advised that it had resolved the concerns expressed in its negative preliminary analysis. National flowed with optimism.
 
 
 26
 On January 28, 1982, the Justice Department raised a question regarding the emission limitation for the electric arc furnace. The EPA took no action in February because of an internal reorganization. Then, in March, the EPA notified National that the consent decree could not be amended directly to incorporate the bubble, but that the Michigan State Implementation Plan (SIP) would need to be revised to incorporate the bubble and the revision approved by the EPA. Although National contends that this was a complete surprise, the consent decree stated that a bubble would have to comply with state and county law.
 
 
 27
 National, despite this new delay, went forward with its bubble application by having the Michigan SIP revised. The revised SIP was submitted to the EPA on June 24, 1982. In reviewing the SIP, the EPA regional office requested additional information on July 14 and 22. The EPA regional office indicated that the review of the SIP would be completed by July 30, 1982. The technical review, however, was not completed until August 19, 1982. The regional office drafted the public notice of approval to be published in the Federal Register, but the sending of the notice and supporting materials from the regional office to the Washington office was unaccountably delayed until September 28, 1982. On October 7, 1982, the Washington office of the EPA asked for 24-hour modeling data.
 
 
 28
 By this time, National started to fret about the delay in its bubble application and repeatedly voiced its concern to the EPA. National entered into an amendment of the consent decree in August of 1982 which extended the compliance date to December 31, 1982. In the amendment, National acknowledged that it would not (emphasis given in the consent decree) be relieved of accrued stipulated penalties, if any, which might become demandable by passage of the final compliance date. Thus, in October, National had less than three months to obtain approval of the bubble or be subjected to the stipulated penalties for not installing the pollution control equipment.
 
 
 29
 The Department of Justice assured National on November 4, 1982 that a final rule still could be promulgated before the December 31, 1982 deadline. Throughout November, the Justice Department notified National that a consensus response to National's dilemma would be forthcoming in a few days. On December 10, 1982, the Washington office of the EPA approved the proposed bubble and indicated that it would forward its approval to the Federal Register for public comment. The notice of EPA's proposed approval was published on December 17, 1982. Since approval of the bubble would not be forthcoming prior to the December 31, 1982 compliance date, the Department of Justice stipulated in an amendment to the decree that it would not seek the stipulated penalties unless (a) the EPA did not take final action on the proposed bubble by April 1, 1983, (b) the EPA disapproved of the bubble, or (c) the EPA's approval was subsequently reversed in the courts.
 
 
 30
 On January 7, 1983, the EPA extended the period for public comment. The Natural Resources Defense Counsel, Inc. made comment and pointed out errors in the modeling which showed that the bubble violated the required air quality standards. National subsequently admitted that the proposed bubble contained errors. On March 30, 1983, the EPA advised National that it would not approve the bubble. The EPA suggested to the State of Michigan that it withdraw its SIP revision. National proposed a new bubble, but the Justice Department instead sought enforcement of the consent decree. By this time, it could be said that National's bubble had burst.
 
 
 31
 The district court found that EPA's activities in processing the bubble were not unreasonable under the circumstances. The bulk of each party's brief has been devoted to presenting the lengthy facts in the light most favorable to itself, and thereafter to casting blame upon the opposite party while largely disregarding evidence of its own fault. If blame was the sole criterion to govern the outcome of this case, there is plenty available to both sides. There is substantial evidence to support the conclusion of the trial judge that National deliberately violated the express terms of the consent decree on the gamble that either the EPA would approve the bubble or that it could force the EPA to do so by including the EPA to respond with "mixed" and hence embarrassing signals. At the same time, there is much evidence to support the claim that the EPA gave mixed signals. The EPA's policy staff and its technical staff were not in harmony as to the propriety of the bubble, and National sought to bypass the technical staff to obtain relief directly from the policymakers. If it were a matter of fault and the agency was giving off mixed signals, the responsibility for the mixed signals is the agency's. It is the agency's duty to keep its own house in order; its duty is not excused merely because National sought advantage from the disharmony.
 
 
 32
 We can accept National's proposition that agency activity in the processing of bubble applications can become so egregious as to amount to a deprivation of substantive due process, although National's reliance upon Bethlehem Steel v. EPA, 638 F.2d 994 (7th Cir.1980), as being dispositive is overstated. We, however, are convinced that the agency conduct of which National complains never rose to proportions serious enough to amount to a deprivation of substantive due process. The command of the consent decree was clear; an application for a bubble would not postpone the compliance dates. The agency always indicated that it would hold National to the terms of the consent decree. In the amendment of the consent decree entered into by the parties and approved by the court in August, 1982, both parties acknowledged the continuing liability of National for the accruing penalties. As the district court found, the EPA's activities in processing the bubble were not unreasonable under the circumstances.
 
 
 33
 National also complains that its due process was violated by an improper commingling of enforcement and policymaking functions, citing Bethlehem Steel, 638 F.2d at 1008-10. In Bethlehem, Bethlehem Steel charged that the same attorneys who were reviewing its delayed compliance order (DCO) were in charge of an on-going enforcement action against Bethlehem, and the attorneys delayed their decision on the DCO in an effort to improve their position in the enforcement action. The court in Bethlehem believed the charges raised sufficient questions to warrant a remand, but it did not endeavor to determine what conduct, if any, might be sufficient to amount to a violation of due process. Because National did not present this issue to the district court, the United States claims we are foreclosed from addressing the issue. Without deciding that question, it is enough, we think, to observe that none of the concerns in Bethlehem arise in the present case. First, as acknowledged by the court in Bethlehem, a certain amount of commingling is normal and acceptable. The involvement of the enforcement personnel was inevitable here, for they were responsible for the enforcement of the consent decree. Second, the enforcement personnel were not one and the same as those who were reviewing the bubble application. Third, to the extent that "policymaking" personnel of the agency were involved, it is apparent that they became involved directly through the activities of National. Finally, while National appears to argue that the enforcement personnel improperly intruded themselves into the decision-making process on the bubble application, it must be remembered that the propriety of the ultimate rejection of that application is not challenged by National. As it acknowledged in its brief before us:
 
 
 34
 National does not contend that it was entitled to approval of its bubble application. Rather, National contends simply that it was entitled to an answer from EPA--"yes" or "no"--in a timely manner so that it could proceed either with implementing the bubble or the emission controls for the No. 2 BOF specified in the Decree. EPA's delay resulted in administrative confusion as to what emission control strategy should be implemented and thereby substantially prejudiced National's ability to implement the control program for the No. 2 BOF within the compliance dates outlined in the Decree.
 
 
 35
 Appellant's Brief at 14.
 
 
 36
 We find, therefore, no substance to National's claim.[1] We therefore hold that the district judge did not err in determining that National had violated the terms of the consent decree and was therefore liable for the penalties stipulated therein.
 
 III.
 
 37
 The sole remaining question is whether the trial court's calculation of penalties was in accord with the provisions of the decree. We conclude that while in all other respects the calculations were correct, the district court erred in not giving effect to the 180-day limitation in Paragraph V.C.3.
 
 
 38
 National contends that the consent decree limits the period of time for which stipulated penalties under the consent decree can be applied for the failure of National to meet its deadlines. The district court did not limit the stipulated penalties, and its interpretation of the consent decree is entitled to some deference. Nonetheless, the interpretation of a consent decree is a legal determination which is free of the clearly erroneous rule. Brown v. Neeb, 644 F.2d 551, 558 n. 12 (6th Cir.1981).
 
 
 39
 National argues that Paragraph V.C.3 of Part B of the consent decree terminates its obligation to pay stipulated amounts as of June 29, 1983. Paragraph V.C.3 reads as follows:
 
 
 40
 If [National] fails to demonstrate compliance with an applicable emission limitation, its obligation to pay under this paragraph shall cease 180 days after the effective date of the limitation.
 
 
 41
 National contends that the "effective date of the limitation" for secondary emissions at the No. 2 BOF was December 31, 1982, the attainment date. Thus, according to National, stipulated penalties associated with the No. 2 BOF compliance schedule could not be assessed beyond June 29, 1983.
 
 
 42
 The United States contends that Paragraph V of the consent decree establishes two separate obligations to pay: (a) stipulated amounts to be paid for failure to comply with an emission limitation, and (b) stipulated amounts to be paid for failure to meet construction or installation schedules. According to the United States, the 180-day limitation was only designed to limit National's exposure in the event that installed equipment fails to achieve the required emissions reduction; it did not limit liability for failure to meet construction or installation schedules.
 
 
 43
 Although the United States contends that the consent decree establishes two separate obligations to pay stipulated amounts, the obligations are interrelated. Paragraph V.A.1 of the consent decree provides that "any stipulated liability [arising from a construction or installation delay] will be subsequently forgiven if [National] ... meets the emission limitations by the attainment date set forth in the schedule." The consent decree also provides that "[National] shall not pay stipulated amounts for failure to meet emission limitations at a facility if it is paying stipulated amounts for failure to meet construction or installation schedules at the same facility." These provisions indicate that the ultimate goal of the consent decree is to meet the emission limitations.
 
 
 44
 Paragraph V.C.3 limits the penalties for failing to meet the emission limitation to 180 days after the effective date of limitation. The United States would have the court interpret the consent decree such that a failure to construct would yield indefinite penalties while failure to meet the emission limitations would yield penalties for only 180 days although in either case the air is being polluted. A more harmonious reading is that Paragraph V.C.3 puts an outer limit on the possible penalties under the consent decree.
 
 
 45
 The United States has contended that such an interpretation of the consent decree provides no incentive for National to finish installing the pollution abatement equipment. The consent decree, however, provides that the 180-day limitation does not limit any other remedies available to the United States for violations of the consent decree or other provisions of the law. The United States could request specific performance of the decree, and in fact obtained such an order from the district court requiring National to install the pollution abatement equipment. By the time of oral argument before us, National had installed the pollution abatement equipment and brought itself into compliance with the emission limitations.
 
 
 46
 The position of the United States represents a rational explanation of what might have been its subjective intent in entering into the consent agreement. Since Paragraph V.C.3 refers to "failure to demonstrate compliance with an applicable emission limitation," the argument that the 180-day cutoff date applies only to penalties for noncompliance with emission limitations has some appeal. The difficulty is, however, that the language of the paragraph in question is clearly to the contrary. Paragraph V.C.3 refers neither to the paragraph providing penalties for emission noncompliance nor to the paragraph providing penalties for construction noncompliance, but instead plainly and without ambiguity broadly speaks of National's obligation "under this paragraph." As so used, the term "paragraph" can only mean Paragraph V in its entirety, and of course that paragraph provides for penalties both for noncompliance with emission limitations and for noncompliance with construction schedules. It is apparent that where the parties wished to refer only to a subparagraph as contrasted with Paragraph V as a whole, they were able to do so, as for example in Paragraph V.A.2 (quoted above) providing for forgiveness of stipulated liability under that subparagraph. Had the United States desired to incorporate into the decree the language it now urges upon the court, it would have been simple enough to have incorporated in Paragraph V.C.3 a specific reference to subparagraph V.B., as was done in Paragraph V.C.1.[2] If there was any ambiguity about the matter, we would in all events be inclined to apply the general proposition that equity and the law abhor forfeitures, and that forfeitures are to be strictly construed. See, e.g., Matter of Erie Lackawanna Ry. Co., 548 F.2d 621 (6th Cir.1977).
 
 
 47
 The stipulated penalties for noncompliance with the consent decree are indeed stiff, but they were agreed to by the parties. Undoubtedly, National Steel was motivated at the time of entry into the agreement by its intention to comply with the provisions of the decree in a timely manner. National also enjoyed the benefit of other provisions of the consent decree; one such provision provided for the forgiveness and refund of $3,500,000 which National paid into escrow pursuant to a consent decree in litigation that was pending in the Northern District of West Virginia. Because the penalties were stiff, it is not surprising that National sought and succeeded in obtaining a limitation on the penalties. Further, since National faced potentially staggering operating losses during the period in question, estimated by its attorneys at oral argument to be in excess of $400,000,000 in 1982, it is not surprising that it would seek and obtain such a limitation.
 
 
 48
 National represents that giving effect to the 180-day provision would limit its liability to those stipulated penalties accruing up to and including June 29, 1983, the date which, according to National, is 180 days after the final "effective date of the limitation" for secondary emissions at No. 2 Basic Oxygen Furnace. This effective date, as ultimately amended by the parties, was December 31, 1982. We hold that National Steel is liable for penalties accruing up to 180 days after the December 31, 1982 effective date. While this holding conflicts with the order of the district court, we note that the question was not expressly addressed by the trial judge, and therefore we cannot give that deference otherwise due the trial judge.
 
 
 49
 Accordingly, the order from which the appeal is taken is VACATED and the cause REMANDED for a recalculation of the appropriate penalties in accordance with this opinion.
 
 
 50
 WISEMAN, District Judge, concurring in part and dissenting in part.
 
 
 51
 I concur with the excellent factual analysis and conclusion of the majority in Parts I and II of the opinion. However, I would affirm the district court in the full assessment of penalties as being not clearly erroneous. I would find, as did the district court, that the position of National with respect to alleged ambiguity in Paragraph V.C.3 is after-the-fact rationalization by ingenious lawyers.
 
 
 52
 I would hold that National made a business decision to take a calculated risk. National risked the imposition of $5 million in penalties against $16 million in capital outlay plus $2 million a year operating cost thereafter. It lost the gamble.
 
 
 53
 Although $5 million in penalties seems harsh, penalties of this magnitude are necessary to counterbalance the gains available to those who refuse to comply with clean air standards, and to protect the public from the demonstrated hazards of pollution of the environment. I fully sympathize with the problems of an endangered company in an industry which has become uncompetitive. I particularly sympathize with the National and other steel company employees whose lives and expectations are shattered by the malaise of the American steel industry. These are public policy matters which are not the province of the courts. Here we are faced with the provisions of a consent decree, entered into voluntarily, by competent corporate officers. I would enforce it.
 
 
 
 *
 Honorable Thomas A. Wiseman, Jr., Chief Judge, United States District Court for the Middle District of Tennessee, sitting by designation
 
 
 [1]
 National makes two other claims which we also find to be without merit. First, National asserts that the trial court should not have awarded the penalties or should have awarded only one-third of the penalties because only the United States sought enforcement of the consent decree while the State of Michigan and Wayne County who were also parties to the consent decree did not. Whether the state and county formally subscribed to the motion demanding the penalties is in our view immaterial. Second, National claims that section 110(a)(2) of the Clean Air Act, 42 U.S.C. Sec. 7410(a)(2), requires the EPA to approve or disapprove proposed SIP revisions within four months of their submittal by the state. Section 110(a)(2) requires action within four months for general state plans submitted under section 110(a)(1), not for revisions to state plans governed by section 110(a)(3)(A)
 
 
 [2]
 V.C.1 provides: The stipulated amount provision of Part B, Paragraph V.B. above shall not apply to visible emission limitations applicable to coke oven batteries, basic oxygen furnace roof monitors, or to mass emission limitations applicable to coke oven batteries. The exclusion as to the basic oxygen furnace roof monitors applies only when the systems are operated at no less than the minimum design evacuation rate