60 F.3d 828
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 James ALLORE, Plaintiff-Appellant,
v.
GENERAL MOTORS CORPORATION, A DELAWARE CORPORATION,
Defendant-Appellee.
 No. 93-2485.
 United States Court of Appeals, Sixth Circuit.
 June 27, 1995.
 
 Before: MILBURN and BATCHELDER, Circuit Judges; and TODD,* District Judge.
 MILBURN, Circuit Judge.
 
 
 1
 Plaintiff James Allore appeals the district court's judgment, following a bench trial, in favor of defendant General Motors Corporation in this action brought under the Labor Management Relations Act ("LMRA"), 29 U.S.C. Sec. 185; and the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. Secs. 1132(a)(1)(B) and 1132(e). In his complaint, plaintiff alleged that defendant's refusal to allow him to transfer from his salaried position to an hourly job amounted to a breach of an oral contract and that defendant should be estopped from refusing his request to transfer because plaintiff detrimentally relied on defendant's promise to allow such a transfer. On appeal, the issues are (1) whether the district court erred in concluding that plaintiff's oral contract with defendant permitted him to transfer to an hourly position only under circumstances relating to job security, (2) whether the district court erred in concluding that plaintiff was not entitled to reinstatement to an hourly position or certain employee benefits because he voluntarily resigned from employment with defendant, and (3) whether the district court erred by failing to address plaintiff's promissory estoppel claim and decide the issue in his favor. For the reasons that follow, we affirm.
 
 I.
 A.
 
 2
 In February 1965, plaintiff James Allore began working for defendant General Motors Corporation as an hourly production worker at defendant's Hydra-matic facility in Ypsilanti, Michigan. At that time, he was a member of a union, the United Automobile, Aerospace & Agricultural Implement Workers of America ("UAW"). In 1966, plaintiff transferred to a salaried position as a clerk in defendant's Hydra-matic Metallurgy Laboratory. Prior to accepting the salaried position, plaintiff interviewed with the general supervisor of the facility, John Mayer.[1] Plaintiff stated that during his interview he voiced concerns about leaving the security of his union position and that Mayer assured him that his seniority would continue to accrue and that he could freely transfer back to an hourly position if he did not like the salaried job. Plaintiff asserts that but for Mayer's representations about his right to transfer, he would not have accepted the salaried position. Nonetheless, plaintiff remained in salaried positions for the duration of his employment with defendant. During that time, he was transferred or promoted on several occasions. Although plaintiff discussed his concerns about each position with his respective supervisor, he admits that no supervisor except Mayer assured him that he had an unfettered right to return to an hourly job.
 
 
 3
 In August or September 1990, one of defendant's suppliers, Belco Industries ("Belco"), began discussions with plaintiff regarding possible employment opportunities. A letter dated September 13, 1990, provided plaintiff with a summary of Belco's employee benefits and an explanation of the salary and bonus schedules for sales personnel. Negotiations between plaintiff and Belco continued during the ensuing months. On January 28, 1991, Michael Kohn forwarded to plaintiff a letter stating: "I am pleased that we were able to come to a mutually agreeable solution which will allow you to join our company .... We look forward to you becoming available to join us as soon as you are able to get the situation with your present employer worked out." J.A. 458. Although Belco cannot confirm that plaintiff accepted its offer of employment before January 28, 1991, it estimates that plaintiff accepted the offer no later than February 18, 1991, when plaintiff's affiliation with Belco was announced in a notice to Belco employees posted on a company bulletin board. Thus, the district court found that plaintiff's desire to accept a position with Belco was one of his motivations for resigning from employment with defendant.
 
 
 4
 Defendant began initiating employee buyout programs in late 1990 and early 1991, in an effort to decrease the size of its work force. Because the programs were part of an attempt by defendant to downsize, facilities like Hydra-matic were not allowed to replace employees who retired or accepted a buyout. In December 1990, plaintiff approached Cynthia Trudell, the chief engineer in his department, about participating in the buyout program being offered to salaried employees. Plaintiff's request was reviewed by the department's Human Resources Group, which denied the request because plaintiff's technical expertise was deemed critical.
 
 
 5
 In January 1991, defendant learned of a buyout program being offered to hourly workers by defendant and the UAW, the Voluntary Termination of Employment Program ("VTEP"). VTEP included a lump sum payment calculated on the basis of an employee's years of seniority. Plaintiff's payment under VTEP would have been approximately $72,000. At the end of January 1991, plaintiff made inquiries about VTEP and his eligibility to participate. After confirming that he would be eligible for the program if he returned to the hourly work force, plaintiff visited Susan Murray, the salaried personnel representative in his department, to request a transfer to an hourly job. On January 30, 1991, plaintiff provided Trudell with a written request for a transfer. During a conversation with Trudell, plaintiff indicated that he believed he had a right to transfer to an hourly position and that he wanted the transfer in order to take advantage of VTEP.
 
 
 6
 Defendant states that it does not have a policy granting former hourly workers the unilateral right to return to an hourly position from a salaried job. Instead, the decision to return a salaried worker to the hourly work force is a matter of management discretion. The sole exception is when a reduction in the salaried work force puts an employee in jeopardy of being laid off. It is only in that situation that defendant is required to transfer an employee, and even then the employee must have sufficient seniority to remain in the bargaining unit.
 
 
 7
 Because Trudell was uncertain about plaintiff's right to "flow back" to an hourly position, she consulted with Murray and Valerie Catchings, the salaried personnel manager at Hydra-matic. Both Murray and Catchings sought information from Jack Gray, a divisional manager with significant personnel experience. Catchings also mentioned the subject at a meeting of 15 to 20 managers from other plants within the division. The consensus was that a salaried employee who requested a return to the hourly work force had no absolute right to such a transfer.[2] Neither Trudell, Catchings, nor Murray discussed the matter with hourly employees who had transferred to or from salaried positions. Trudell denied plaintiff's request for a transfer, citing the same critical need for plaintiff's technical expertise that had supported the denial of plaintiff's request to participate in the buyout of salaried personnel. Trudell also said that she was refusing the transfer because under defendant's downsizing program, it would mean a permanent loss to her department.
 
 
 8
 Plaintiff was informed that his request for a transfer had been denied in a meeting with Trudell and Murray on February 4, 1991. On February 5, 1991, plaintiff submitted a second written request for a transfer. Plaintiff asserts that on Tuesday, February 5, 1991, Trudell told him that she could not stop him from transferring and that his last day in a salaried position would be February 15, 1991. He states that on Thursday, February 7, 1991, Trudell renounced her earlier position and informed him that he would not be allowed to transfer. On February 27, 1991, plaintiff submitted to the personnel department a memorandum wherein he stated, "I am requesting to exercise my option to return to the hourly work force." J.A. 370. That request was denied on February 28, 1991. Plaintiff resigned from his employment with defendant the same day. He began working for Belco on March 1, 1991. Plaintiff states that he is not aware of any other former hourly worker whose request to transfer back to an hourly job from a salaried position has been denied.
 
 B.
 
 9
 Plaintiff filed this action in Washtenaw County (Michigan) Circuit Court on December 3, 1991. Defendant removed the action on February 4, 1992. On May 28, 1993, defendant filed a motion for summary judgment, which the district court denied on August 25, 1993. Plaintiff subsequently filed a first amended complaint on September 22, 1993.
 
 
 10
 A bench trial was conducted on October 25 and 26, 1993. Following the trial, the district court made the following findings: (1) the parties entered into an oral contract that induced plaintiff to take a salaried position; (2) the contract was limited to circumstances relating to job security; (3) plaintiff sought a transfer to an hourly position in order to take advantage of the VTEP buyout, which would have amounted to a windfall for plaintiff; (4) plaintiff voluntarily quit his employment with defendant on February 28, 1991; and (5) because plaintiff voluntarily resigned, defendant was not required to reinstate him or pay him VTEP benefits. Accordingly, the district court entered judgment in favor of defendant on October 26, 1993. This timely appeal followed.
 
 II.
 A.
 
 11
 Plaintiff argues that the district court erred in concluding that his contract with defendant did not grant unfettered transfer rights but offered only a right to transfer under circumstances related to job security. Plaintiff asserts that this conclusion lacks any support in the record because it is contrary to the testimony of other employees at Hydra-matic and because defendant did not produce reliable testimony to this effect.
 
 
 12
 Under Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 52(a), the judge in a trial conducted without a jury must issue the findings of fact and conclusions of law on which his decision is based. The "[f]indings of fact ... shall not be set aside unless clearly erroneous." Fed. R. Civ. P. 52(a). A district court's finding of fact is clearly erroneous "'when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake had been committed."' Anderson v. City of Bessemer City, 470 U.S. 564, 573 (1985) (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948)); In re H.J. Scheirich Co., 982 F.2d 945, 949 (6th Cir. 1993). The clearly erroneous standard does not allow a reviewing court to reverse the district court's findings merely because it would have decided the case in a different manner. Henry v. Lennox Indus., Inc., 768 F.2d 746, 750 (6th Cir. 1985). "As long as the trial court's findings are 'reasonable and supported by the evidence,' they may not be overturned." H.J. Scheirich Co., 982 F.2d at 949. In addition, when the district court's findings are based on credibility determinations, greater deference is due the court's decision because "only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." Anderson, 470 U.S. at 575.
 
 
 13
 The district court in this case found that "there was a contract or an understanding between the plaintiff and the defendant in this particular matter in relation to [plaintiff's transfer], and that was one of the inducements for the plaintiff to take a salary position with the defendant." J.A. 361. The district court further found that "the contract between the parties was the ability to go back to the hourly ranks; however, under certain circumstances. The circumstances that the Court finds as a matter of fact ... related to job security." J.A. 362. Finally, the district court found that taking advantage of VTEP or other buyout programs was not one of the circumstances for which plaintiff was given transfer rights.[3] In essence, the district court found that a contract did exist between plaintiff and defendant but that the contract was not breached when defendant refused plaintiff's request for a transfer.
 
 
 14
 We conclude that the district court's findings are not clearly erroneous but are reasonable and supported by substantial evidence in the record. See United States v. National Steel Corp., 767 F.2d 1176, 1179-80 (6th Cir. 1985). In support of its assertion that plaintiff did not receive unilateral transfer rights, defendant produced the testimony of Jack Gray, a personnel manager with over 30 years of experience with defendant's personnel policies. Gray confirmed that until 1990, it had not been defendant's policy to grant employees an absolute right to transfer to the hourly work force. Gray stated that, with one exception, such transfers require management approval. Pursuant to Sec. 1406.3 of defendant's "Policy and Procedure Covering Salaried Personnel in the United States and Canada," a copy of which was admitted at trial, and "Working With General Motors," a publication distributed to employees that plaintiff admits having received, defendant is required to transfer a salaried employee back to the hourly work force only when the employee is facing a lay off as a result of a reduction in the salaried work force. Gray's testimony on this issue was corroborated by Frank McGeogh, a longtime personnel manager for defendant.[4]
 
 
 15
 In addition, there is ample support for the district court's conclusion that the contract did not grant plaintiff the right to return to hourly work solely to obtain VTEP benefits or take advantage of other employee buyout programs. These programs were not available in 1966, when plaintiff allegedly received the representations about his right to transfer. McGeogh testified that buyout programs were begun in 1987 or 1990. Since these programs did not exist at the time plaintiff transferred to the salaried work force, he could not have made guaranteed receipt of these benefits a condition of his contract with defendant.
 
 
 16
 Plaintiff argues that the district court's findings ignore his testimony about the representations Mayer made to him in 1966, and overlook defendant's widely acknowledged policy of transferring salaried workers back to the hourly work force. Plaintiff testified that in response to his concern about leaving the security of a union position, Mayer made the following statement: "Well, that shouldn't make any difference, because if you don't like the [salaried] job you can always go back to hourly." J.A. 237. This statement need not be read as an assurance that plaintiff had a unilateral right to return to hourly work at any time for any number of years. The district court may plausibly have assumed that Mayer's representation gave plaintiff a right to return to the hourly work force if he did not like the clerk position into which he was transferring, a form of job security for anxious new employees. An interpretation of this statement as a limited assurance is consistent with the policy defendant adopted in 1990. That employees are now given only one year to reach a decision indicates that their transfer rights are limited to returns from their initial salaried positions.
 
 
 17
 Plaintiff also relies on his observation of salaried employees who, over the years of his employment with defendant, have been allowed to transfer back to the hourly work force. However, plaintiff admits that he has no personal knowledge of how those transfers occurred or the channels through which those employees' requests to transfer travelled. Thus, plaintiff cannot rely on his observations as evidence that any employee has been granted a unilateral right to transfer. Defendant does not deny that transfers have been approved; it claims only that, except when job security concerns are at issue, such transfers are a matter of management discretion.[5]
 
 
 18
 Plaintiff makes much of defendant's new policy on transfer rights. He argues that because the new policy was intended to tighten defendant's control over employees and because the policy gives transferees a limited unilateral right to return to the hourly work force, employees who transferred from an hourly position prior to the policy change must have had a broader right. However, we conclude that the district court did not err in analyzing the effect of the policy change. It is not the case, as plaintiff claims, that the district court's interpretation of the policy gives new salaried personnel greater rights than persons like plaintiff who transferred into a salaried position prior to December 1990. The new policy gives recent transferees a unilateral right to demand a transfer during the first year of their salaried work but takes away the right to transfer in case of a work force reduction, a right that plaintiff indisputably possessed. This exchange is consistent with defendant's intention to downsize and its need to comply with job banks requirements and secured employee levels. Furthermore, we note that the new policy gave employees who transferred from the hourly work force prior to 1990 the chance to receive the same benefit defendant was offering new transferees. This demonstrates defendant's understanding that employees who transferred prior to 1990 did not have an unfettered right to transfer.
 
 
 19
 Finally, plaintiff argues that the district court's conclusions are clearly erroneous because they contradict the testimony of a group of seven employees, each of whom shared a similar understanding of defendant's practice and policy relating to transfers from salaried positions to the hourly work force. The district court found Frederick Thomas to be the most important of these witnesses. In his testimony, Thomas admitted that his belief that he could return to the hourly work force was "an assumption on my part only to the fact that I knew that it was happening with other people .... Nobody ever promised me or anything like that." J.A. 142. Thomas denied that he had ever seen such a policy set forth in writing. He also indicated that a transfer to an hourly position took the form of a "request," not a demand. J.A. 156. Plaintiff points to the fact that Thomas retired shortly after his return to the hourly work force and claims that "Thomas considered doing something very similar to what [plaintiff] considered doing." Appellant's Brief at 37. This ignores Thomas' testimony, which clearly stated that Thomas did not intend to retire at the time he requested the transfer but that the program under which he retired became available after he transferred. Accordingly, we conclude that Thomas' testimony clearly supports the district court's findings.
 
 
 20
 Plaintiff asserts that the testimony of Joseph Gray is particularly important because Gray stated that he was told by his supervisor that he had an absolute right to return to an hourly position "if [he] didn't like the salaried position if it didn't work out." J.A. 163. Gray transferred back into an hourly job after about four years because he no longer liked his salaried position. Plaintiff argues that Gray's testimony that his supervisors initially objected to the transfer and attempted to dissuade him from it demonstrates the error in the district court's finding that management possessed authority to refuse transfer requests. We disagree. Gray's testimony does not foreclose the possibility that management approved the transfer, and Gray need not have possessed a unilateral right to return to the hourly work force.
 
 
 21
 Similar statements were given by Ronald Luttermosier, James Michalek, Jack Chenault, George Deverich, and Roger Alan Buxton, each of whom testified either that he was told he had nothing to lose by transferring to a salaried position because he could go back to hourly work or that he believed he had such a right based on personal observation. The representations about which these witnesses testified, however, are the same sort of limited assurances that plaintiff received. The district court did not commit clear error by finding that these employees never enjoyed a unilateral right to transfer, or that, to the extent they were given such a right, that it was limited to a transfer from their first salaried jobs. We have already noted that assumptions about transfer rights based on observation are not enough to show clear error. The fact that some salaried employees were transferred into the hourly work force does not negate defendant's claim that the transfers were approved at management's discretion. Defendant's decision to allow some employees to return to the hourly work force is not necessarily inconsistent with its refusal of plaintiff's request because plaintiff's expertise was deemed critical. Finally, we note that several of these witnesses mentioned job security in discussing their perceived right to transfer; Michalek stated that the transfer right was important to him because he valued the job security it provided. Thus, after reviewing the evidence, we are not left with a definite and firm conviction that the district court erred in finding that plaintiff's contract was limited to circumstances related to job security.
 
 B.
 
 22
 Plaintiff next argues that the district court erred in finding that he was not entitled to VTEP benefits or to reinstatement to an hourly position because he voluntarily resigned from his employment with defendant. Plaintiff asserts that he was "ready, willing and able to report to the hourly work force," Appellant's Brief at 44, and that he had not resigned at the time defendant breached its contract with him by refusing to honor his absolute right to transfer into an hourly position. The district court's finding that plaintiff is not entitled to reinstatement or benefits because he voluntarily resigned involves a mixed question of law and fact. Such issues are reviewed by this court de novo. Paul Revere Life Ins. Co. v. Brock, 28 F.3d 551, 553 (6th Cir. 1994); Taylor and Gaskin, Inc. v. Chris-Craft Indus., 732 F.2d 1273, 1277 (6th Cir. 1984). In addition, when a district court interprets provisions in a contract, its conclusions are freely reviewable by this court. Policy v. Powell Pressed Steel Corp., 770 F.2d 609, 612 (6th Cir. 1985), cert. denied, 475 U.S. 1017 (1986).
 
 
 23
 Although plaintiff correctly asserts that reinstatement is a proper remedy in breach of employment contract actions, see Davis v. Combustion Eng'g, Inc., 742 F.2d 916, 922 n.5 (6th Cir. 1984); Stafford v. Electronic Data Sys. Corp., 749 F. Supp. 781, 784 (E.D. Mich. 1990) (citing Ritchie v. Michigan Consol, Gas Co., 413 N.W.2d 796, 803 (Mich. Ct. App. 1987) (per curiam)), he has not demonstrated his entitlement to such a remedy. See Fleming v. Ayers & Assocs., 948 F.2d 993, 998 (6th Cir. 1991). Plaintiff merely reiterates that the district court's findings regarding the scope of his contract with defendant are erroneous and argues that defendant breached the contract before he resigned. We have already determined that the district court did not err in concluding that plaintiff's contract with defendant granted him transfer rights only in circumstances involving job security, not retirement benefits, and that defendant did not breach the contract by refusing plaintiff's request to transfer in order to participate in VTEP. Because defendant did not breach the contract, an award of reinstatement or benefits on the basis of such a breach is inappropriate.
 
 
 24
 Furthermore, the evidence does not support plaintiff's claim that he was forced to resign. Plaintiff argues, in effect, that defendant's refusal to honor his request to transfer amounted to a "constructive discharge." Such a discharge can serve as the basis for an award of reinstatement or benefits. See Gomez v. Great Lakes Steel Div., Nat'l Steel Corp., 803 F.2d 250, 256 (6th Cir. 1986). However, a constructive discharge involves "working conditions ... so difficult or unpleasant that a reasonable person would have felt compelled to resign." Pitts v. Michael Miller Car Rental, 942 F.2d 1067, 1072 (6th Cir. 1991). In order to find a constructive discharge, a court must examine the employer's intent and the reasonably foreseeable effect of its actions. Henry v. Lennox Indus., Inc., 768 F.2d 746, 751-52 (6th Cir. 1985); Jenkins v. Southeastern Mich. Chapter, Am. Red Cross, 369 N.W.2d 223, 229 (Mich. Ct. App. 1985). Plaintiff has not produced any evidence of oppressive or disagreeable working conditions. He argues only that he felt "he didn't have any other choice but to quit" when defendant refused to allow him to transfer. J.A. 446. Moreover, it is illogical to assert that defendant's intent was to force plaintiff to resign; defendant's refusal to allow a transfer was based on its critical need for plaintiff's expertise. In addition, the evidence shows that plaintiff had accepted a new position at a higher salary by no later than February 18, 1991, and that plaintiff may have intended to resign regardless of the availability of the buyout or an hourly position. Thus, we find no error in the district court's conclusion that plaintiff voluntarily resigned from his employment with defendant and therefore, he is not entitled to reinstatement or payment of VTEP benefits.[6]
 
 C.
 
 25
 Lastly, plaintiff argues that the district court erred by failing to address his promissory estoppel claim and by failing to decide the issue in his favor. Plaintiff asserts that the district court should have found that defendant made a promise to plaintiff that it should have known he would rely on, which he did in fact rely on, and that in the interest of avoiding injustice, plaintiff deserves a remedy. Furthermore, plaintiff argues that if he is not awarded some measure of recovery, defendant will have been allowed to enjoy the benefits of its contract with plaintiff, but plaintiff will not have received any benefit from the bargain.
 
 
 26
 At the conclusion of the trial in this case, the district court found that defendant's agent had made a promise to plaintiff that he could transfer from a salaried position to an hourly job in circumstances involving plaintiff's job security but that the transfer rights offered by defendant did not include the right to transfer in order to accept a buyout offered to hourly employees. Despite these findings, plaintiff argues that the district court failed to address his promissory estoppel claim. We disagree. Although the district court could have been more specific in addressing plaintiff's claim, the findings of fact and conclusions of law announced by the district court were clearly intended to resolve both plaintiff's breach of contract claim and his promissory estoppel claim.[7] Unless plaintiff can point to error in the district court's findings, we conclude that they are enough to dispose of plaintiff's promissory estoppel claim and that the district court therefore did not neglect to address plaintiff's claim. Plaintiff implicitly acknowledges this fact in his brief since his argument on this issue deals with the merits of the district court's findings.
 
 
 27
 The doctrine of promissory estoppel is well-recognized by the courts in Michigan. See, e.g., Leila Hosp. and Health Ctr. v. Xonics Medical Sys., Inc., 948 F.2d 271, 275 (6th Cir. 1991); State Bank of Standish v. Curry, 500 N.W.2d 104, 107 (Mich. 1993); McMath v. Ford Motor Co., 259 N.W.2d 140, 142 (Mich. Ct. App. 1977) (per curiam). In order to successfully assert a promissory estoppel claim, a plaintiff must establish the existence of four factors: (1) a promise; (2) that the promisor should reasonably have expected would induce the promise to take action of a definite and substantial character; (3) which did in fact cause the promisee's reliance or forbearance; and (4) which must be enforced if injustice is to avoided. Leila Hosp., 948 F.2d at 275; Charter Township of Ypsilanti v. General Motors Corp., 506 N.W.2d 556, 559 (Mich. Ct. App. 1993) (per curiam). In this case, plaintiff argues, again, that defendant, through Mayer, made an unconditional promise to plaintiff that he could return to an hourly position from the salaried work force at any time and under any circumstances. Plaintiff asserts that the testimony of other employees confirmed that defendant's agents regularly made such promises. He also asserts that the practice of transferring back to an hourly position in order to take advantage of certain retirement benefits was so common that it was recognized by defendant in a memorandum in 1990.
 
 
 28
 However, we have already upheld the district court's finding that the promise made by defendant was limited to circumstances involving plaintiff's job security and was not broad enough to cover the collection of retirement benefits. Thus, plaintiff cannot establish the core requirement for a promissory estoppel claim, namely, the existence of a promise. See State Bank, 500 N.W.2d at 108; Barber v. SMH (US), Inc., 509 N.W.2d 791, 797 (Mich. Ct. App. 1993) (per curiam). Without a showing of a definite and firm promise to allow unconditional transfer rights, plaintiff's claim must fail. See Leila Hosp., 948 F.2d at 275 (regarding the existence of a definite and firm promise as the threshold issue).
 
 
 29
 Finally, plaintiff argues that allowing him to receive VTEP benefits would, at most, confer upon him the benefit of his bargain with defendant. He emphasizes that but for Mayer's representations about his right to transfer, he would not have taken a salaried position in 1966. However, "[a]dditional reliance, other than simply accepting and continuing employment, is necessary for an estoppel claim." Dumas v. Auto Club Ins. Ass'n, 425 N.W.2d 480, 490 (Mich. Ct. App. 1988) (per curiam). Moreover, because we agree with the district court's finding as to the scope of defendant's promise, we find this argument meritless. For 25 years after plaintiff became a salaried employee, he never once attempted to transfer back to an hourly position--until he saw the opportunity to benefit from VTEP. Furthermore, plaintiff has been promoted or transferred to various salaried positions since he originally entered the salaried work force, and there is no evidence that Mayer's original representations played any role in plaintiff's willingness to fill those succeeding positions, thus diminishing the substantial nature of his reliance on defendant's alleged representations. We therefore conclude that the district court did not err in rejecting plaintiff's promissory estoppel claim.
 
 III.
 
 30
 For the reasons stated, the judgment of the district court is AFFIRMED.
 
 
 
 *
 Honorable James D. Todd, United States District Judge for the Western District of Tennessee, sitting by designation
 
 
 [1]
 Mayer is deceased, thus precluding any confirmation of plaintiff's recollection of the interview
 
 
 [2]
 In December 1990, defendant modified its policy regarding transfers between hourly and salaried positions. The new policy grants employees transferring from an hourly position after December 1, 1990, one year to decide whether they want to remain in the salaried position or return to the hourly work force. An attachment to the new policy stated that "[i]f the employe[e] relinquishes the right to return, it means that they could not at any time in future [sic] request to return to hourly for the purpose of retiring from hourly or for any other reason." J.A. 378. Thus, an employee who has elected to remain in a salaried position no longer has any transfer rights. However, the new policy did not affect plaintiff and others like him who transferred into salaried positions prior to December 1990, and who refused to relinquish any transfer rights they had
 
 
 [3]
 Plaintiff objects to the district court's finding that he would have received a windfall had he been allowed to return to the hourly work force in order to participate in VTEP. Plaintiff argues that this amounts to an unauthorized reconstruction of the contract's terms. See Ginsberg v. Reliable Linen Serv. Co., 290 N.W. 331, 333-34 (Mich. 1940). Plaintiff argues that he was entitled to the VTEP buyout because had he remained an hourly worker he would have undoubtedly been allowed to participate in the program and because his contract included a unilateral right to return to an hourly position. Because we agree with the district court's finding that plaintiff did not enjoy unilateral transfer rights, we find this argument meritless. Furthermore, the district court's determination that plaintiff would have received a windfall is merely part of its analysis of plaintiff's argument, not a reconstruction of plaintiff's contract
 
 
 [4]
 Plaintiff argues that McGeogh's deposition testimony contradicted his testimony at trial and that his deposition testimony supported plaintiff's argument that he possessed a unilateral right to transfer. However, we conclude that the apparent inconsistencies in McGeogh's testimony can be explained consistent with the district court's findings, and, to the extent that the district court relied on McGeogh's testimony in reaching its decision, we will not question its reliance. See Anderson, 470 U.S. at 575
 
 
 [5]
 Plaintiff argues that this case is analogous to Arnone v. Chrysler Corp., 148 N.W.2d 902 (Mich. Ct. App. 1967). In Arnone, the state court of appeals found that the defendant employer not only was required to reinstate an employee, who had been a member of a bargaining unit and had accepted a supervisory position but who had then decided to transfer back into the bargaining unit, but also had to accord the employee the same benefits and seniority he would have received had he remained in the unit. Arnone, 148 N.W.2d at 905. However, Arnone is distinguishable from this case. In Arnone, the district court was not concerned with whether the plaintiff had a right to be reinstated in a bargaining unit position; it was merely concerned with the level of the plaintiff's benefits. In this case, the district court examined whether plaintiff had a right to transfer at all; his benefits were not in question
 
 
 [6]
 Plaintiff directs our attention to two Michigan cases holding that the party who first breaches a contract cannot recover damages relating to another party's subsequent nonperformance or breach of the contract. Verran v. Blacklock, 231 N.W.2d 544, 547 (Mich. Ct. App. 1975); Flamm v. Scherer, 198 N.W.2d 702, 706 (Mich. Ct. App. 1972). However, these cases are inapposite. We have already concluded that defendant did not breach its contract with plaintiff, thus precluding reliance on the rule announced in these cases. Moreover, Verran and Flamm prohibit a breaching party from maintaining a cause of action against, or recovering damages from, another contracting party. Verran, 231 N.W.2d at 547; Flamm, 198 N.W.2d at 706. That is not the case before us
 
 
 [7]
 This court follows a liberal standard in assessing the adequacy of a district court's findings, Grover Hill Grain Co. v. Baughman-Oster, Inc., 728 F.2d 784, 792 (6th Cir. 1984), and "[f]indings are to be liberally construed in support of a judgment," id. at 793. The articulation of specific findings is not a jurisdictional requirement of appeal. Urbian v. Knapp Bros. Mfg. Co., 217 F.2d 810, 816 (6th Cir. 1954), cert. denied, 349 U.S. 930 (1955). As long as this court is able to fully understand the issues addressed by the district court and appealed by plaintiff, and as long as the record reveals the basis for the district court's action and supports such action, the failure to issue specific findings of fact or conclusions of law is not reversible error. Huard-Steinheiser, Inc. v. Henry, 280 F.2d 79, 84 (6th Cir. 1960); see Trans Union Credit Info. Co. v. Associated Credit Servs., Inc., 805 F.2d 188, 193 (6th Cir. 1986)